## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CYNTHIA GLASS**,

      *Plaintiff,*

    v.

**RAY LAHOOD**, Secretary, U.S.
Department of Transportation,

      *Defendant.*

Civil Action No. 08-01516 (CKK)

## MEMORANDUM OPINION
(May 20, 2011)

Plaintiff Cynthia Glass ("Glass"), an African American female, commenced this action

against the Secretary of the U.S. Department of Transportation pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, claiming that she was

discriminated and retaliated against in the course of her employment as a Safety Defects Engineer

with the National Highway Traffic Safety Administration (the "NHTSA"), an operating

administration within the U.S. Department of Transportation. Glass asserts two basic claims in

this action: (a) first, she contends that the NHTSA discriminated against her on the basis of her

race and sex when she was not selected for a competitive position in or about June or August

2007 (the "Non-Selection Claim"); and (b) second, she contends that the NHTSA discriminated

against her on the basis of her race, and retaliated against her for participating in protected

activity, when she was denied a promotion in October 2007 (the "Failure-to-Promote Claim").

Presently before the Court is the NHTSA's [25] Motion for Summary Judgment, which Glass has

opposed. Based on a searching review of the parties' submissions, the relevant authorities, and

the record as a whole, the Court shall grant the NHTSA's motion in full and dismiss this action

in its entirety.[1]

# I. PRELIMINARY MATTERS

Preliminarily, the Court pauses to make a few overarching observations about the nature of Glass's opposition to the NHTSA's Motion for Summary Judgment. The United States District Court for the District of Columbia has supplemented Rule 56 of the Federal Rules of Civil Procedure with Local Civil Rule 7(h)(1), which requires that each party submitting a motion for summary judgment attach a statement of material facts for which that party contends there is no genuine dispute. The party opposing the motion must, in turn, submit a responsive statement enumerating all material facts that the party contends are genuinely disputed. *See* LCvR 7(h)(1). Both the moving party's initial statement and the opposing party's responsive statement must be based on "references to the parts of the record relied on to support the statement."[2] *Id.* This well-reasoned rule "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett &*

---

[1] While the Court renders its decision today on the record as a whole, its consideration has focused on the following documents, listed in chronological order of their filing: Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. [25-1]; Def.'s Stmt. of Undisputed Material Facts ("Def.'s Stmt."), ECF No. [25-2]; Pl.'s Mem. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. [29]; Pl.'s Resp. as to Def.'s Recitation of Material Facts Not in Dispute and Pl.'s Additional Material Facts Which Are in Dispute, ECF No. [30-1]; Def.'s Reply Mem. in Further Supp. of Def.'s Mot. for Summ. J., ECF No. [32]; Def.'s Reply to Pl.'s Resp. as to Def.'s Recitation of Material Facts Not in Dispute and Pl.'s Additional Material Facts Which Are in Dispute ("Def.'s Resp."), ECF No. [32-1].

[2] In this way, Local Civil Rule 7(h)(1) aligns with the relatively recent amendments to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c)(1) & (3) (requiring parties to "cit[e] to particular parts of materials in the record" and providing that "[t]he court need consider only the cited materials.").

*Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). As the parties in this case have been cautioned on multiple occasions, this Court strictly adheres to the dictates of Local Civil Rule 7(h)(1) when resolving motions for summary judgment. *See* Scheduling & Procedures Order (Apr. 30, 2009), ECF No. [15], at 4-5; Dispositive Mots. Scheduling Order (Oct. 29, 2009), ECF No. [24], at 1.

In connection with its Motion for Summary Judgment, the NHTSA has filed a statement of material facts in conformity with the strictures imposed by Local Civil Rule 7(h)(1). Glass has submitted a responsive statement responding to each of the factual statements set forth in the NHTSA's statement, and has identified a number of additional factual allegations which she contends support her claims, but her submissions fall short of what is required in several material respects. Although the Court shall address each of these defects at various points in this memorandum opinion, two warrant mentioning at the outset because they are recurring and have hindered the NHTSA's ability to render a meaningful response and complicated this Court's resolution of the instant motion.

> ### A. The Court Shall Disregard Glass's Conclusory Allegations that Her Supervisors' Opinions Were "Tainted" By an Unlawful Animus

In her responsive statement, Glass repeatedly purports to dispute factual statements identified by the NHTSA on the grounds that they turn in part on her supervisors' involvement and that her supervisors' subjective opinions of her were allegedly "tainted" by discriminatory or retaliatory animus. In each instance, Glass fails to support her response with citations to competent evidence in the record, electing instead to rely upon entirely conclusory and unsupported allegations that her supervisors were somehow guided by an improper motive.

Simply by way of example, citing to evidence in the record, the NHTSA contends that Glass's immediate supervisor believed that Glass's job performance met—but did not exceed—

the overall expectations for someone at Glass's level and grade. *See* Def.'s Stmt. ¶ 13. Glass answers this factual contention as follows:

> Plaintiff disagrees with the facts stated. This is a material fact in dispute. Plaintiff argues that [her supervisor's] subjective opinions are tainted by racial bias and retaliation.

Pl.'s Stmt. ¶ 13. Glass cites to no evidence—none—in support of her response, and rather rests upon her own unsupported and non-specific allegation that her immediate supervisor harbored an unlawful or improper animus.

Unfortunately, this very same defect carries throughout Glass's responsive statement. *See* Pl.'s Stmt. ¶¶ 13-16, 30, 32, 49-50. Simply put, Glass's chosen approach is patently inadequate to establish a genuine dispute as to the factual matters identified by the NHTSA in its statement of material facts. *See Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir.) (concluding that the district court properly disregarded conclusory allegations of discriminatory animus), *cert. denied*, 549 U.S. 993 (2006); *Robinson v. Duncan* __ F. Supp. 2d __, 2011 WL 1319084, at *7 (D.D.C. Apr. 7, 2011) (faulting the plaintiff for "present[ing] nothing aside from conclusory allegations from which a reasonably jury could conclude that [the decision-maker] acted with discriminatory or retaliatory animus."). In the final analysis, Glass fails to supply any basis for concluding that the factual matters identified by the NHTSA are genuinely in dispute. Were the Court to accept such conclusory allegations as creating a genuine dispute of material fact, it "would defeat the central purpose of the summary judgment device," which is to identify those cases sufficiently meritorious to warrant a jury trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). The Court shall therefore disregard all such conclusory allegations proffered by Glass in opposition to the instant motion.

**B.**     ***The Court Shall Disregard the Additional Factual Allegations Identified By Glass that Are Unaccompanied By Citations to the Record***

Separately, Glass identifies a number of additional factual allegations at the conclusion of her responsive statement—a total of ten—which she contends support her claims.  *See* Pl.'s Stmt. ¶¶ 62-71.[3]  But in setting forth these ten allegations, Glass again fails to cite to competent evidence in the record, and instead cites almost exclusively to the legal memorandum that she has offered in opposition to the instant motion, apparently with the aim of incorporating the factual and legal argument made in the cited pages.  *See id.*  However, the Local Rules of this Court require Glass to support each individual factual statement identified in her responsive statement with supporting references to the record.  *See* LCvR 7(h)(1).  As Glass is no doubt aware, legal memoranda are not evidence and cannot themselves create a factual dispute sufficient to defeat a motion for summary judgment.  *See Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 106 n.9 (D.D.C. 2010).  Glass's attempt to broadly incorporate a multitude of unspecified facts set forth in a separate filing directly contradicts both the spirit and the letter of Local Civil Rule 7(h)(1), impermissibly shifts counsel's burden to locate and identify the relevant facts, and leaves this Court to guess as to which of the many factual statements set forth in Glass's opposition memorandum are disputed and, if disputed, whether the dispute is genuine. *See Sloan v. Urban Title Servs., Inc.*, 689 F. Supp. 2d 94, 99 (D.D.C. 2010) (disregarding parties' attempts to incorporate by reference the factual statements made in separate filings).

A single example of this deficiency will suffice for present purposes.  In her responsive

---

[3]  For purposes of continuity, the Court will refer to Glass's additional factual allegations as if they were consecutively numbered paragraphs continuing the sequence of her responses to the NHTSA's factual allegations, and it will adopt the same approach when referring to the NHTSA's reply to those additional factual allegations.

statement, Glass broadly avers that her immediate supervisor's "bonuses, evaluations and other treatment of other African Americans infers [sic] racial bias." Pl.'s Stmt. ¶ 66 (citing Pl.'s Opp'n at 25-27). But nowhere in her responsive statement does Glass attempt to articulate the specifics of the "bonuses, evaluations and other treatment" claimed to be at issue or to identify the "other African Americans" she has in mind. Instead, she purports to incorporate a total of three pages of her opposition memorandum, wherein she argues at length that the supervisor in question gave certain African American employees under his supervision disproportionately smaller annual bonuses and less favorable performance evaluations. *See* Pl.'s Opp'n at 25-27. From these three pages, the Court can glean at least sixteen discrete factual allegations that are altogether absent from Glass's responsive statement of material facts.

This deficiency is not merely technical—by failing to identify discrete factual allegations in her responsive statement and to support those allegations with specific citations to the record, Glass has deprived the NHTSA of an opportunity to render a meaningful and targeted response. Indeed, in its reply statement of facts, the NHTSA has rejoined in each instance that Glass's proffered statement "contains argument, not facts," and that her "opposition brief is not evidence." Def.'s Resp. ¶¶ 62-71. While the NHTSA often sets forth in its reply memorandum an overarching explanation as to why Glass's various arguments nonetheless fail to create an inference of discrimination or retaliation, it has quite reasonably declined to attempt to individually respond to the scattershot and disjointed factual allegations that are set forth in Glass's opposition memorandum but are altogether absent from her responsive statement. The upshot is that the record fashioned by the parties does not fully crystallize for this Court the material facts that are in dispute and, if disputed, the extent of the dispute—an outcome that is

entirely attributable to Glass's failure to comply with the Local Rules of this Court and her patently unacceptable attempt to shift her burden to crystallize the factual record supporting her arguments to the NHTSA and this Court.

In an exercise of its discretion, the Court shall disregard all the additional factual allegations set forth in Glass's responsive statement that are unsupported by specific citations to the record and that instead rest entirely upon the incorporation of an unidentified universe of additional factual allegations set forth somewhere in her opposition memorandum, again without adequate citation to evidence in the record. *See* Pl.'s Stmt. ¶¶ 62-71. Separately, taking its cue from the NHTSA, the Court will also explain why, even crediting the scattershot and disjointed factual allegations set forth in Glass's opposition memorandum, her arguments are unpersuasive on the merits. Nonetheless, the Court emphasizes here that Glass has failed to support these arguments with competent record support in the manner required by the Local Rules of this Court, which provides a separate and independent ground for rejecting them outright. The Court is mindful that this conclusion may foreclose a broad swath of arguments tendered by Glass in opposition to the instant motion, but the fault for this result must lie with Glass herself and not the NHTSA or this Court.

## II. BACKGROUND

Glass, an African American female, was hired by the NHTSA on December 2, 2002 as a grade GS-13 Safety Defects Engineer in the Vehicle Integrity Division of the Office of Defects Investigation. Def.'s Stmt. ¶¶ 1, 6 & Ex. D; Pl.'s Stmt. ¶¶ 1, 6. As a Safety Defects Engineer, Glass is responsible for evaluating potential defects in vehicles and determining whether a defect presents a safety-related issue. Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.

For most of the time period relevant to the instant action, Glass's first-line supervisor was Thomas Cooper ("Cooper"), the Chief of the Vehicle Integrity Division, while her second-line supervisor was Kathleen DeMeter ("DeMeter"), the Director of the broader Office of Defects Investigation. Def.'s Stmt. ¶¶ 2-3; Pl.'s Stmt. ¶¶ 2-3. The only exception pertains to the first half of 2007, when Glass was assigned to a temporary detail in the Correspondence Research Division, a separate division within the Office of Defects Investigation. Def.'s Stmt. ¶¶ 2-3; Pl.'s Stmt. ¶¶ 2-3. During that particular time period, Glass reported directly to DeMeter. Def.'s Stmt. ¶¶ 2-3; Pl.'s Stmt. ¶¶ 2-3.

A.    **The NHTSA's Merit Promotion Plan and Promotions for Safety Defects Engineers**

Like many federal employers, the NHTSA maintains a written Merit Promotion Plan, the stated objectives of which are to "assure staffing with the best-qualified candidates available, and to assure that employees have the opportunity to develop and advance to their full potential while also observing the best utilization of current resources." Def.'s Ex. E at 2. The Merit Promotion Plan sets forth the competitive procedures that generally apply to promotions to positions grade GS-15 and below. *See id.*; Decl. of Darlene Peoples ("Peoples Decl."), ECF No. [25-4], ¶ 8. However, it expressly exempts from its coverage "career promotions," a category that includes two types of promotions that are relevant to this action—namely, "career ladder" promotions and "desk audit" promotions. Def.'s Ex. E at 5.

Under the career ladder promotion process, promotions to a higher grade within a designated "career ladder" can occur without further competition provided that the intent was made a matter of record before the position was filled. Def.'s Ex. E at 5, Attach. C at 1. An employee can climb the ladder until he or she reaches the "full performance level" for the

position in question, at which point "there is no further advancement opportunity in the position." *Id.* at Attach. C at 3. According to the terms of the Merit Promotion Plan, this ceiling is imposed because "[t]he full performance level represents a grade to which all employees in the job series can aspire because there is enough work in the series at the full performance level for all members of the group." *Id.* at Attach. C at 1.

Under the desk audit promotion process, promotions to a higher grade can hypothetically occur along with an employee's "accretion of duties" over time. Def.'s Ex. E at 5; Peoples Decl. ¶ 17. According to Darlene Peoples, the Director of the Office of Human Resources, desk audit promotions are a rare occurrence at the NHTSA.[4] Peoples Decl. ¶ 17. Further, they must be supported by a formal narrative position classification evaluation report; the new position must be a clear successor to the former position; no other qualified, comparable employee in the same organizational unit may be denied an opportunity to compete for the position; and the promotion cannot create an additional position or vacancy. *See id.*

Glass and other Safety Defects Engineers are on a career ladder that runs from GS-5/7 to GS-13. Def.'s Ex. E, Attach. C at 1; Peoples Decl. ¶ 12. Grade GS-13 represents the top of the ladder and there is no further advancement opportunity under the career ladder promotion process once an employee reaches that grade. Def.'s Ex. E, Attach. C at 1, 3 & Ex. F at 86; Peoples Decl. ¶ 12. Because Glass was initially hired by the NHTSA as a grade GS-13 Safety Defects Engineer, she was already at the full performance level for her position at the outset of her employment. Def.'s Stmt. ¶ 6 & Ex. D; Pl.'s Stmt. ¶ 6.

---

[4] The last desk audit promotion for a grade GS-13 Safety Defects Engineer in the Vehicle Integrity Division occurred in May 2002, before Glass joined the NHTSA. *See* Def.'s Ex. G ¶ 9.

Within the Office of Defects Investigation, grade GS-14 is considered the "expert" performance level. Def.'s Stmt. ¶ 15 & Ex. G ¶ 6; Pl.'s Stmt. ¶ 15. Cooper, the Chief of the Vehicle Integrity Division, explains that an employee must demonstrate that he or she is a "technical engineering expert, and has detailed knowledge, skills and experience investigating a field" in order to be eligible for a promotion to the position of a grade GS-14 Safety Defects Engineer. Def.'s Stmt. ¶ 11; Pl.'s Stmt. ¶ 11. Similarly, the employee must put into practice his or her knowledge and skills, demonstrate a mastery of the issues, have a full understanding of technical details, and develop investigation recommendations that are supported and reflect a sophisticated level of analysis. Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 12; Def.'s Resp. ¶ 12.

Because Glass was already at the top of her career ladder at the outset of her employment, there were two basic avenues by which she might hypothetically secure a promotion to a grade GS-14 Safety Defects Engineer. First, Glass could pursue a promotion through the desk audit promotion process, which has been consistently described as an unusual occurrence at the NHTSA. Second, and more likely, Glass could attempt to secure the promotion in accordance with the competitive procedures set forth in the Merit Promotion Plan, a process that is generally initiated when an employee's supervisor prepares a proposal to advertise a competitive position at the GS-14 level. Def.'s Stmt. ¶ 7 & Ex. F at 85-87; Pl.'s Stmt. ¶ 7(c).[5] That would require the employee's supervisor with sufficient authority—in this case, DeMeter—to determine that Glass

_____

[5] Glass contends that the NHTSA does not actually advertise the grade GS-14 positions that are at issue in this action and that promotions to grade GS-14 in the Office of Defects Investigation are instead based on "preselection." Pl.'s Stmt. ¶ 7(a) (citing Def.'s Ex. E). However, in making this assertion, the only evidence in the record cited by Glass in response to this paragraph is the Merit Promotion Plan itself, which in no way supports her contention and is therefore insufficient to create a genuine dispute as to the matter identified.

had the potential to perform at the GS-14 level and that there was actually a need for someone to perform at that level.[6]  Def.'s Stmt. ¶ 7 & Ex. F at 85-87; Pl.'s Stmt. ¶ 7(a)-(b).  Were DeMeter to reach that conclusion, she would then forward the relevant approval paperwork to Ronald Medford ("Medford"), the Senior Associate Administrator for Vehicle Safety, who is in turn responsible for deciding whether it is appropriate to advertise a position at a given grade level.  Def.'s Stmt. ¶¶ 8-9 & Ex. F at 85-87; Pl.'s Stmt. ¶¶ 8-9.

### B.    Glass's Failure-to-Promote Claim and Assessments of Her Performance

Glass personally believes that she has deserved a promotion to grade GS-14 since 2003, the year following her arrival at the NHTSA.  Def.'s Stmt. ¶ 20; Pl.'s Stmt. ¶ 20.  She first raised the issue with Cooper, the Chief of the Vehicle Integrity Division and Glass's immediate supervisor for the vast majority of her employment, in 2004, and she has revisited the issue with him periodically over the succeeding years.  Def.'s Stmt. ¶ 21; Pl.'s Stmt. ¶ 21.  Through her

---

[6] Glass purports to dispute this statement insofar as it suggests that a supervisor has the authority to determine that there is a need in the office for someone to be performing at the GS-14 level.  *See* Pl.'s Stmt. ¶ 7(b) (citing Def.'s Ex. E).  However, in making this assertion, Glass cites broadly to the Merit Promotion Plan—a single-spaced, thirty-three page document.  *See* Def.'s Ex. E.  Simply put, Glass has failed to point this Court to anything in the Merit Promotion Plan that would support her position, and the Court can glean nothing to that effect from its independent review of the document.  Indeed, setting aside the fact that the proposition is commonsensical, the terms of the Merit Promotion Plan are consistent with the NHTSA's contention that an employee's supervisor must first determine that there is a need for someone to perform at a level above and beyond the top of a designated career ladder before advertising a position at that level.  By its plain language, once an employee reaches his or her "full performance level," there simply is no further advancement opportunity in the position.  *Id.* at Attach. C at 3.  The express rationale for creating this ceiling is that "[t]he full performance level represents a grade [for which] . . . *there is enough work in the series at the full performance level for all members of the group*."  *Id.* at Attach. C at 1 (emphasis added).  In order to justify creating a position at a grade above the full performance level, the relevant supervisor must determine that there is, so to speak, "more than enough work" than can be performed with current staffing—in other words, that there is a "need in the office for someone to be performing at the [] level."  Def.'s Stmt. ¶ 7.

Failure-to-Promote Claim, Glass alleges that she was unfairly denied a promotion to a grade GS-14 Safety Defects Engineer at a specific time—in October 2007—when she met with Cooper concerning her annual performance review. *See* Compl., ECF No. [1], ¶ 20. Glass maintained a journal containing her contemporaneous notes about actual events—which she named "It Ain't Right"—and described her encounter with Cooper in her journal in the following manner:

> Per Tom: I am a strong GS-13; need to anticipate every possibility; I should get the step increase as scheduled. He will not advertise for the GS-14 because my past work does not demonstrate the GS-14.

Def.'s Stmt. ¶¶ 33-34; Pl.'s Stmt. ¶¶ 33-34.

In Cooper's assessment, Glass met the expectations for a grade GS-13 Safety Defects Engineer, but her job performance never exceeded those expectations. Def.'s Stmt. ¶ 13 & Ex. G ¶ 13; Pl.'s Stmt. ¶ 13. Consistent with this assessment, Glass received a performance rating of "achieved results"—a rating which falls between "minimally satisfactory" and "exceeded expectations" on the relevant performance rating scale—for performance years 2005 through 2007.[7] *See* Def.'s Ex. G ¶ 13 & Ex. P. In other words, she was consistently rated as an average employee of her grade and position, no more and no less.

In particular, Cooper expressed concerns about Glass's level of understanding of the issues presented by investigations and the logic of her approach for gathering and analyzing information. Def.'s Stmt. ¶ 14 & Ex. G ¶ 16; Pl.'s Stmt. ¶ 14. According to Cooper, Glass failed to demonstrate the potential to perform at the GS-14 level and had not shown that she had the ability to independently manage complex investigations. Def.'s Stmt. ¶ 15 & Ex. G ¶ 6; Pl.'s

---

[7] At the NHTSA, performance years do not coincide perfectly with the calendar year, but rather extend roughly from the fall of one year to the fall of the next.

Stmt. ¶ 15. Citing these concerns, Cooper never recommended Glass for a promotion to grade GS-14.[8] Def.'s Stmt. ¶ 16, Ex. F at 90-91, & Ex. G ¶ 8; Pl.'s Stmt. ¶ 16. Cooper advised DeMeter of Glass's interest in a promotion, and Cooper and DeMeter discussed the level and quality of Glass's work and expertise and both agreed that Glass's performance remained at the GS-13 level. Def.'s Ex. F at 90-91 & Ex. G ¶ 8.

Unsurprisingly, Glass disagrees with these assessments of her performance. For example, Glass testified at her deposition that she personally believes that she has demonstrated sufficiently independent investigatory skills and that she is a technical expert in the field of fire investigations. Def.'s Stmt. ¶ 22 & Ex. B at 136; Pl.'s Stmt. ¶ 22. She also testified that the quality of her work on each of the investigations that she worked on since the year after she joined the NHTSA has shown that she performs at a GS-14 level. Def.'s Stmt. ¶ 22 & Ex. B at 136; Pl.'s Stmt. ¶ 22. However, when asked during the course of written discovery to identify each of the investigations that she contends demonstrate her ability to work at the GS-14 level, Glass specifically identified only three investigations. Def.'s Stmt. ¶ 24 & Ex. I at 33-34; Pl.'s Stmt. ¶ 24. Two of those investigations—referred to by the parties as the Pontiac Vibe and Mitsubishi Galant investigations—were not even opened until early 2008, the year *after* Glass claims she was unfairly denied a promotion to grade GS-14. Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25. The third—referred to as the Ford Expedition investigation—opened on October 13, 2005 and

_____

[8] Despite his stated opinion that Glass was not performing at a level that would justify promoting her to grade GS-14, Cooper consistently provided Glass with various opportunities to secure training in a field in which she might potentially become a technical expert—namely, fire investigations—and offered her opportunities to work on investigations coinciding with her interests. Def.'s Stmt. ¶ 17; Pl.'s Stmt. ¶ 17. For example, with Cooper's assistance, Glass registered for and attended three fire training classes between March 2006 and December 2007. Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶ 18.

closed on December 6, 2005.  Def.'s Stmt. ¶ 26; Pl.'s Stmt. ¶ 26.

The Ford Expedition investigation involved allegations that water leaks around the vehicle's windshield caused a number of electrical component malfunctions, some of which were safety-related and others of which were not safety-related.  Def.'s Stmt. ¶ 26; Pl.'s Stmt. ¶ 26. Glass's closing report for the investigation went through numerous re-writes, with as many as nine drafts.  Def.'s Stmt. ¶ 27; Pl.'s Stmt. ¶ 27.  Her first draft contained a chart that purported to show a high incidence of windshield wiper failures related to water leaks around the vehicle's windshield.  Def.'s Stmt. ¶ 28; Pl.'s Stmt. ¶ 28.  But while her draft claimed to show the warranty data of windshield wiper failures due to water intrusion, the data Glass used actually reflected the number of all windshield wiper failures regardless of cause, a much larger number.  Def.'s Stmt. ¶ 29; Pl.'s Stmt. ¶ 29.  From Cooper's perspective, this error was the result of Glass's failure to scrutinize the data before she included it in her draft report, with the end result being that there was an unacceptable disconnect between the data and her recommendation that the investigation be closed.  Def.'s Stmt. ¶ 30; Pl.'s Stmt. ¶ 30; Decl. of Thomas Z. Cooper ("Cooper Decl."), ECF No. [25-3], ¶¶ 14-15.  In his opinion, Glass's early drafts did not make recommendations that were supportable, requiring significant editing to prepare a final report.  Def.'s Stmt. ¶ 32 & Ex. C at 87; Pl.'s Stmt. ¶ 32.

For her part, Glass does not actually dispute that there were legitimate questions about the quality of her work on the Ford Expedition investigation, but attempts to minimize those questions by suggesting that "she was doing her very first closing report" and intimating that Cooper should bear some of the blame because he was involved in the re-writing process.  Pl.'s Stmt. ¶ 31; Def.'s Resp. ¶ 31 & Ex. C at 71-72.  Contrary to Glass's assertions, Cooper does not

appear to claim that he did not bear at least some of the responsibility for the final work product as Glass's immediate supervisor.[9] Even if he did, that does not change the fact that it is undisputed that there were real deficiencies in Glass's work product on the Ford Expedition investigation—which is the only work product that Glass has specifically identified as evidencing her purportedly GS-14 quality work that she actually performed before she was denied a promotion in October 2007.

C.   *Glass's Temporary Detail as the Acting Co-Director of the Correspondence Research Division*

The Correspondence Research Division is the unit within the Office of Defects Investigation that is responsible for responding to correspondence from the general public and managing document storage and redaction.  Def.'s Stmt. ¶ 35; Pl.'s Stmt. ¶ 35.  In December 2006, the position of the Director of the Correspondence Research Division—a GS-14 level position—became vacant when the incumbent retired.  Def.'s Stmt. ¶ 35; Pl.'s Stmt. ¶ 35.  Prior to the position being filled on a permanent basis, DeMeter sought volunteers to serve a temporary detail as Acting Director.  Def.'s Stmt. ¶ 36; Pl.'s Stmt. ¶ 36.  When those initial efforts proved unsuccessful, DeMeter asked the various division chiefs within the Office of Defects Investigation—a group that included Cooper—to see if anyone within their respective divisions would be interested in the temporary detail.  Pl.'s Stmt. ¶ 31; Def.'s Resp. ¶ 31 & Ex. F at 15.  While not altogether clear from the record, the Court assumes that Cooper did not approach

_____

[9]   At his deposition, Cooper testified that he sent the final report to the Office of Chief Counsel even though he was not completely satisfied with its contents because he was concerned about the time frame for completing investigations.  Def.'s Ex. C at 72.

Glass at this time.[10]  Pl.'s Stmt. ¶¶ 19, 36; Def.'s Resp. ¶¶ 19, 36.

Subsequently, DeMeter decided to split the Acting Director position into two separate functions—one for correspondence and a second for document handling.  Def.'s Stmt. ¶ 36; Pl.'s Stmt. ¶ 36.  Thereafter, DeMeter asked Cooper if he would check with Glass to gauge her interest in the detail because DeMeter was aware that Glass was interested in being promoted to grade GS-14 and thought the detail might offer her an opportunity to show what she could do in a different arena.[11]  Def.'s Stmt. ¶ 37; Pl.'s Stmt. ¶ 37.  Similarly, Cooper thought that the detail would provide Glass with an opportunity to demonstrate her abilities and compete for the permanent position.  Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19.  Cooper asked Glass if she would consider accepting the temporary detail, and she accepted the position.[12]  Def.'s Stmt. ¶ 19; Pl.'s

---

[10]  DeMeter testified at her deposition that an initial e-mail solicitation was sent to all NHTSA employees, a group that obviously would have included Glass, soliciting interest in the temporary detail.  *See* Def.'s Ex. F at 15.  The NHTSA appears to rely on DeMeter's testimony to suggest that Glass did not initially express an interest in the temporary detail after receiving this e-mail, with the apparent aim of undermining any suggestion that Cooper later delayed asking Glass whether she was interested in the temporary detail.  However, because this contention was not clearly and directly raised until the NHTSA filed its reply papers, and because DeMeter's testimony about the e-mail, which is not itself in the record, is arguably hearsay, the Court does not rely on DeMeter's testimony in this regard.

[11]  At the same time, DeMeter also asked Cooper to approach a second employee.  *See* Def.'s Ex. F at 18-19.

[12]  Glass appears to question Cooper's motives in approaching her with the temporary detail opportunity only after DeMeter specifically asked him to do so, though it is never made altogether clear what import, if any, she attaches to the suggestion.  *See* Pl.'s Stmt. ¶ 19 (citing Def.'s Ex. F at 15-16).  In support, Glass cites exclusively to DeMeter's deposition testimony, in which DeMeter merely stated in passing that she previously asked the division chiefs, a group that would have included Cooper, "to check around to see if anyone . . . was interested in the job."  Def.'s Ex. F at 15.  But the record created by the parties is entirely silent on the circumstances surrounding these events.  Neither party has pointed this Court to any evidence that would indicate one way or another whether Cooper ever considered approaching Glass (or, for that matter, any other employee) with the temporary detail opportunity before he was

16

Stmt. ¶ 19. At the time of her acceptance, Glass was not aware that the responsibilities would be split between two employees, but once apprised, she did not have any objection to the division of responsibilities. Def.'s Stmt. ¶ 41; Pl.'s Stmt. ¶ 41.

Under the Merit Promotion Plan, a "detail" is defined as the temporary assignment of an employee to a different position or set of duties, with no change in grade or pay, for a specified period of time, with the employee returning to his or her position at the end of the assignment. Def.'s Stmt. ¶ 42; Pl.'s Stmt. ¶ 42. Glass concedes that she was aware at the time she accepted the position that it would not come with extra pay. Def.'s Stmt. ¶ 43; Pl.'s Stmt. ¶ 43. Indeed, she stated precisely that in her journal around the time of her acceptance, writing, "I accepted the detail. The detail did not include an increase in pay." Def.'s Ex. Q at 2.

Ultimately, the Acting Director of the Correspondence Research Division position was split between Glass, who was responsible for the correspondence function, and Cheryl Rose ("Rose"), a grade GS-14 Safety Defects Engineer, who was responsible for the document-

---

specifically asked to do so by DeMeter. Similarly, assuming that there was something more than a *de minimis* delay between DeMeter's initial request to an unspecified set of division chiefs that they "check around" and her specific instruction to Cooper that he approach Glass to ascertain her interest, the record does not indicate the length of the delay or, more importantly, the explanation for the delay. Meanwhile, there was indisputably an intervening event that precludes drawing any neat inferences from the record—between the time of DeMeter's initial request and her specific instruction to Cooper, the temporary detail had been divided into two separate functions. Simply put, any number of wildly divergent inferences could be drawn from this skeletal record. To the extent Glass intends to suggest that this Court should infer that Cooper was guided by a discriminatory motive, the inference simply is not justifiable based on the present record. *See Carney v. Am. Univ.*, 151 F.3d 1090, 1093 (D.C. Cir. 1998) ("The nonmovant . . . , while entitled to all *justifiable* factual inferences, retains the burden of pointing to affirmative evidence establishing a genuine factual dispute.") (internal quotation marks omitted; emphasis added). In any event, the dispute, if any, is largely immaterial. Glass does not contend that she was discriminated against in her appointment to the temporary detail and has never contended that Cooper's alleged delay in bringing the opportunity to her attention is independently actionable.

handling function.  Def.'s Stmt. ¶ 38; Pl.'s Stmt. ¶ 38.  Glass performed the duties of her detail

on a full-time basis, while Rose retained her other investigatory duties.  Def.'s Stmt. ¶ 39; Pl.'s

Stmt. ¶ 39.  Glass's detail spanned the first half of 2007, during which time DeMeter served as

Glass's direct supervisor.  During this period, DeMeter discovered several errors in the

correspondence that Glass was sending to the general public as part of her responsibilities, errors

which caused DeMeter some concern about the quality of Glass's work product.  Def.'s Stmt. ¶¶

44-45; Pl.'s Stmt. ¶¶ 44-45.

### D. *The Selection of the Permanent Director of the Correspondence Research Division and Glass's Non-Selection Claim*

In March 2007, the NHTSA formally announced the vacancy in the Director of the

Correspondence Research Division position.  Def.'s Stmt. ¶ 46; Pl.'s Stmt. ¶ 46.  The permanent

position—which would combine the two functions that were split for purposes of the temporary

detail—would involve monitoring the development of systems for maintaining safety defect data

and coordinating responses to all correspondence received by the Correspondence Research

Division.  Def.'s Stmt. ¶ 55; Pl.'s Stmt. ¶ 55.  DeMeter was the recommending official for the

position.  Def.'s Stmt. ¶ 47; Pl.'s Stmt. ¶ 47.  Medford, the Senior Associate Administrator for

Vehicle Safety, was the selecting official.  Def.'s Stmt. ¶ 54; Pl.'s Stmt. ¶ 54.

Glass applied for the position but was informed sometime in June or August 2007 that

she was not selected.  The selection process began in earnest when the NHTSA's Office of

Human Resources provided DeMeter with a broad list of candidates satisfying the basic criteria

for the position.  Def.'s Ex. R ¶ 5.  DeMeter assigned two subordinates to cull the list of

candidates and to return it to the Office of Human Resources for further processing.  *Id.*

Subsequently, the Federal Highways Administration—a separate administration within the U.S.

Department of Transportation that administers the "QuickHire Process" that was used for filling the vacancy—scored the applicants' responses to a detailed questionnaire, and the final certificate identifying the five remaining candidates and their respective scores was forwarded to DeMeter for her further consideration.[13]  Def.'s Stmt. ¶ 49 & Ex. Y; Pl.'s Stmt. ¶ 49; Peoples Decl. ¶¶ 20-21.

DeMeter's first choice for the position was Russel Rosen ("Rosen"), a white male, whom she initially thought had the highest score of the various candidates.  Def.'s Stmt. ¶ 51; Pl.'s Stmt. ¶ 51.  But DeMeter ultimately did not recommend Rosen for the position.  After she notified a representative from the Office of Human Resources that she intended to recommend

---

[13]  Glass purports to challenge the admissibility of the scoring certificate on the basis that "it is not known how the scores which appear . . . were generated." Pl.'s Stmt. ¶ 49.  She then speculates that, "[t]o the extent that either Ms. DeMeter and/or Mr. Cooper ha[d] any input into the scores listed for the candidates, [she] would argue that such marks . . . may have been tainted by racial and or retaliatory animus." *Id.*  But Glass offers no evidence to support her speculation, and fails to explain why she did not seek discovery as to how the scores were generated and by whom.  *Cf.* Fed. R. Civ. P. 56(d).  Meanwhile, the NHTSA has adduced uncontradicted evidence that the scoring was conducted primarily by an independent agency and that neither DeMeter nor Cooper had any meaningful involvement in the process.  Here, Glass has failed to come forward with "affirmative evidence" establishing a genuine factual dispute.  *Carney*, 151 F.3d at 1093.  Nor is there any merit to Glass's separate and unexplained contention that the scoring certificate is somehow inadmissible hearsay.  *See* Pl.'s Stmt. ¶ 49.  Setting aside the fact that the certificate is almost certainly a "record . . . of regularly conducted business activity," Fed. R. Evid. 803(6), it is not even hearsay to begin with because it is not "offered in evidence to prove the truth of the matter[s] asserted," Fed. R. Evid. 801(c).  Regardless of whether the candidates' scores were appropriately or accurately calculated, the relevant focus is the information that was before the decision-maker—in this case, DeMeter—and it is undisputed that these were the scores with which she was presented at the time she was evaluating candidates.  Even assuming the scores were somehow "untrue," in the sense they were inaccurate, that would not support an inference that DeMeter acted with a discriminatory or retaliatory animus in selecting someone other than Glass for the position unless there was also some reason to believe that DeMeter knew the scores were inaccurate.  But again, the uncontradicted evidence in the record shows that DeMeter had no meaningful involvement in the process until the final scores were provided for her further consideration.

Rosen for selection, she was informed that a second candidate—Ronald Fields ("Fields")—an African American male, had a ten-point veterans' preference that placed his score above Rosen's score. Def.'s Stmt. ¶¶ 48, 52; Pl.'s Stmt. ¶¶ 48, 52. Absent the veterans' preference, Rosen would have obtained the highest score among the five final candidates. The breakdown of the final scores for the five identified candidates was as follows:

| Candidate | Score |
|---|---|
| Ronald Fields | 98.07 |
| Russel Rosen | 96.40 |
| Carmen Bell | 93.57 |
| Cynthia Glass | 90.35 |
| Catherine Downs | 88.69 |

Def.'s Ex. Y at 1.

Significantly, DeMeter was not informed that Fields had received a higher score than Rosen due to his ten-point veterans' preference until *after* she had already expressed her inclination to select Rosen, whom she initially believed had the highest score. Def.'s Stmt. ¶ 52; Pl.'s Stmt. ¶ 52. When she was advised that, if she still wished to select Rosen instead of Fields, she would have to draft a memorandum justifying why Rosen was more qualified for the position and detailing the reasons why the NHTSA was passing over a veteran, DeMeter elected instead to recommend Fields, whom she then understood to have the highest score among all the candidates. Def.'s Stmt. ¶¶ 53-54; Pl.'s Stmt. ¶¶ 53-54. Based upon DeMeter's recommendation, Medford interviewed Fields and found him to be qualified for the job. Def.'s Stmt. ¶ 54; Pl.'s Stmt. ¶ 54. At the time of his application, Fields was an employee with the Bureau of Land Management within the U.S. Department of the Interior, and had prior

experience with the Occupational Safety and Health Administration. Def.'s Stmt. ¶¶ 48, 52; Pl.'s Stmt. ¶¶ 48, 52. His experience extended to investigating systems, catastrophes, fatalities, and accidents, and producing formal and informal findings, data summaries, briefings, summary documentation, investigations, inspections, reviews, presentations, recommendations, and procedures. Def.'s Stmt. ¶ 56; Pl.'s Stmt. ¶ 56.

### III. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact, and therefore "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted," *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). Stated differently, the mere existence of a "scintilla of evidence" in support of the non-movant's position will not suffice; there must be enough evidence on which the jury could reasonably find for the non-movant. *Talavera v. Shah*, __ F.3d __, 2011 WL 1120285, at *2 (D.C. Cir. Mar. 29, 2011).

In recognition that it may be difficult for the plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent, the district court should approach summary judgment in such actions with "special caution." *Aka v. Washington*

*Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nevertheless, the plaintiff is not relieved of her obligation to support her allegations with competent evidence establishing that there is a genuine dispute of material fact. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). As is always the case, where the plaintiff will bear the burden of proof at trial on a dispositive issue, she bears the burden of production to designate specific facts showing that there is a genuine dispute for trial. *Ricci v. DeStefano*, __ U.S. __, 129 S. Ct. 2658, 2677 (2009). Absent this burden, a party could effectively defeat the "central purpose" of the summary judgment device—"to weed out those cases insufficiently meritorious to warrant . . . a jury trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene*, 164 F.3d at 675. With these principles in mind, the Court turns to the merits of the NHTSA's Motion for Summary Judgment.

## IV. THE SCOPE OF THIS ACTION

The Court begins by delineating the boundaries of this action. Due in large part to Glass's opaque and disjointed submissions, it has never been made entirely clear to this Court—or, presumably, the NHTSA—whether Glass intends to suggest that various experiences she allegedly had during the course of her employment with the NHTSA constitute discrete acts of discrimination or retaliation and whether she intends to pursue them as independently actionable claims in this action. Ultimately, the ambiguity is immaterial. Even assuming that Glass intended to pursue such claims in this action, she has either failed to exhaust her administrative remedies as to those claims or has failed to incorporate them into her Complaint. As a result, she cannot pursue them as independent claims in this action, which is therefore confined to Glass's Non-Selection Claim and her Failure-to-Promote Claim.

### A. Glass Cannot Pursue Claims that the NHTSA Failed to Promote Her to a GS-14 Level Position in 2003, 2004, 2005, and 2006

Before commencing suit under Title VII, federal employees must fully exhaust their administrative remedies, and they must do so in a timely manner. *See* 42 U.S.C. § 2000e-16(c); *Harris v. Gonzales*, 488 F.3d 442, 443 (D.C. Cir. 2007). Under the broad authority conferred upon it by Congress, the Equal Employment Opportunity Commission "has established detailed procedures for the administrative resolution of discrimination complaints" raised by federal employees. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). Two of those procedures are of particular relevance to this action.

First, an "aggrieved" federal employee "must initiate contact with a[n EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). The limitations period begins to run when the employee "knew, or should have known, about the alleged discriminatory action." *Stewart v. Ashcroft*, 352 F.3d 422, 425 (D.C. Cir. 2003). Because "[t]he purpose of EEO counseling is . . . to enable the agency and its employee to try to informally resolve the matter before an administrative charge is filed," the employee must provide "sufficient information to enable the agency to investigate the claim." *Artis v. Bernanke*, 630 F.3d 1031, 1035 (D.C. Cir. 2011) (internal quotation marks omitted).

Second, if the matter is not resolved after the counseling period, the employee must file a formal written administrative complaint with the alleged discriminating agency within 15 days after receiving notice from the EEO counselor. *See* 29 C.F.R. § 1614.106(a)-(b). While the administrative charge requirement "should not be construed to place a heavy technical burden" on the discrimination plaintiff, it is "not a mere technicality" and the district court "cannot allow

liberal interpretation of an administrative charge to permit a litigant to bypass the . . . administrative process." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks and citations omitted), *cert. denied*, 519 U.S. 811 (1996). If the employee later brings suit in federal court, she will be limited to pursuing those "claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.*

These administrative time limits are not jurisdictional but rather are akin to statutes of limitations. *Bowden*, 106 F.3d at 437. Ordinarily, "the plaintiff who fails to comply, to the letter, with administrative deadlines . . . will be denied a judicial audience." *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (internal quotation marks omitted). The district court may not consider a claim that has not been properly exhausted absent a basis for applying equitable tolling, estoppel, or waiver. *See Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008).

In this case, Glass first sought EEO counseling on June 19, 2007. Def.'s Stmt. ¶ 58; Pl.'s Stmt. ¶ 58. She first filed a formal administrative complaint with the NHTSA on August 1, 2007, which she amended on November 30, 2007. Def.'s Stmt. ¶¶ 59, 61; Pl.'s Stmt. ¶¶ 59, 61. As amended, Glass's formal administrative complaint included three separate claims. Two of those claims were the same two claims that are at issue in this action—namely, the Non-Selection Claim and the Failure-to-Promote Claim. *See* Def.'s Stmt. ¶¶ 59-61 & Exs. AA-CC; Pl.'s Stmt. ¶¶ 59-61. The third claim was based on an allegation that Glass was discriminated against on the basis of her race when she was not promoted to the position of a grade GS-14 Safety Defects Engineer in October 2006, the year *before* the events that give rise to the Failure-to-Promote Claim at issue in this action. *See* Def.'s Stmt. ¶¶ 59-61 & Exs. AA-CC; Pl.'s Stmt. ¶¶ 59-61. On the administrative level, the NHTSA dismissed the last of these claims—the

October 2006 failure-to-promote claim—on the basis that Glass failed to initiate contact with an EEO counselor within 45 days of the alleged underlying conduct. Def.'s Stmt. ¶ 60 & Ex. AA; Pl.'s Stmt. ¶ 60.

Unsurprisingly, the NHTSA raises the same exhaustion argument in its opening memorandum, arguing that Glass failed to timely exhaust her administrative remedies as to her October 2006 non-promotion claim because she failed to initiate contact with an EEO counselor within 45 days of the underlying conduct. *See* Def.'s Mem. at 19. In opposition, Glass offers no rejoinder to the argument. In this Circuit, "it is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004); *accord Lewis v. District of Columbia*, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam). Because Glass has completely failed to contest the NHTSA's argument, the Court shall, in an exercise of its discretion, treat the argument as conceded. Regardless, the record supports the NHTSA's position. Glass did not initiate contact with an EEO counselor until June 19, 2007, meaning that she can only pursue relief for discrete acts of discrimination occurring on or after August 3, 2007—that is, 45 days before she initiated contact. *See* 29 C.F.R. § 1614.105(a)(1). The Supreme Court has observed that a failure-to-promote claim is an easily identifiable discrete act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Because Glass failed to initiate contact with an EEO counselor within 45 days after she allegedly was not promoted to the position of a grade GS-14 Safety Defects Engineer in October 2006, she failed to exhaust her administrative remedies in a timely manner

26

and is barred from pursuing the claim in this action.

The same holds true to the extent Glass intended to assert individual claims that the NHTSA failed to promote her to a GS-14 level position in 2003, 2004, or 2005, something that is not entirely clear from the face of Glass's various submissions. *See* Compl. ¶ 15 ("Ms. Glass . . . did not receive a promotion to GS-14 in 2003, 2004, [and] 2005."). In its opening memorandum, the NHTSA similarly argues that any such claims would be barred because Glass failed to initiate contact with an EEO counselor within 45 days of the underlying conduct. *See* Def.'s Mem. at 19-20. Because Glass failed to address the argument in opposition, the Court shall treat the argument as conceded. Regardless, because each of these discrete acts predates August 3, 2007—that is, 45 days before Glass initiated contact with an EEO counselor—it is clear that Glass failed to exhaust her administrative remedies in a timely manner and is barred from pursuing any such claims in this action.

**B.**    ***Glass Cannot Pursue Discrete Claims Based on Allegations Identified in Her Discovery Responses But Absent From Her Complaint***

The allegations raised in Glass's August 1, 2007 formal administrative complaint form the basis of her Complaint in the instant action. *See* Def.'s Exs. BB-CC; Compl. In the course of discovery, Glass was asked to identify all of the employment actions that she contends were adverse and that she intends to pursue in the instant action. *See* Def.'s Ex. I at 22-25. In response, Glass identified four specific employment actions, claiming that they were raised in two formal administrative complaints filed *after* her August 1, 2007 administrative complaint, all of which the NHTSA contends are not properly before this Court.[14] Summarizing Glass's

---

[14] Neither party has introduced these administrative complaints into the record.

27

allegations, the four events at issue are as follows:

1.    The early closing of a vacancy announcement for the Acting Chief of the Early Warning Division in March 2008;

2.    The failure to promote Glass to a GS-14 level position in connection with her midterm performance review on April 30, 2008;

3.    The failure to provide Glass with a more desirable office or cubicle location in June 2007 and May 2008; and

4.    The failure to announce the availability of a detail to the Acting Chief of the Correspondence Research Division in or about June 2008.

*See* Def.'s Ex. I at 22-25.

In its opening memorandum, the NHTSA argues that these allegations are not identified in the Complaint and therefore are not properly before this Court. *See* Def.'s Mem. at 19 n.2. In opposition, Glass offers no rejoinder to the NHTSA's argument, and therefore the Court shall treat the argument as conceded. *See Hopkins*, 284 F. Supp. 2d at 25. Regardless, the NHTSA is correct that these allegations "fault [the NHTSA] for conduct identified nowhere in the original complaint,"[15] *Jones v. Bernanke*, 557 F.3d 670, 675 (D.C. Cir. 2009), and because Glass has never sought to amend her Complaint to include such allegations, they are not properly before the Court. *See Sloan*, 689 F. Supp. 2d at 120 ("[P]arties may not amend their operative pleadings through discovery."). Therefore, she may not pursue these allegations as discrete claims in this action, which is therefore confined to two claims—the Non-Selection Claim and the Failure-to-

_____

[15]   While the Complaint does include a generalized reference to alleged requests by Glass for a promotion in the context of "each annual performance review . . . and mid-year reviews," which at first glance might be construed to encompass the second of the identified allegations, Glass expressly limits that allegation to the years "2003, 2004, 2005, and 2006." Compl. ¶ 15.

Promote Claim.[16]

## V. DISCUSSION

In this Circuit, once the employer has proffered a legitimate, non-discriminatory reason for a challenged employment action, the "central question" becomes whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *accord Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011). "[T]hese principles apply equally to retaliation claims." *Jones*, 557 F.3d at 678. Generally speaking, a claim should proceed to the jury if the plaintiff is able to point to evidence from which a jury could reasonably find that the employer's stated reasons for the challenged employment action were pretextual. *Calhoun*, 632 F.3d at 1261; *see also Pardo-Kronemann v.*

---

[16] In its opening memorandum, the NHTSA also argues at some length that two additional allegations are non-actionable either because they do not constitute materially adverse actions or because they are directly contradicted by admissions made by Glass—specifically, Glass's allegation that she was deprived of extra pay in connection with her temporary detail to the Correspondence Research Division and her contention that she was embarrassed by the way DeMeter informed her of her non-selection for the permanent Director of the Correspondence Research Division position. *See* Def.'s Mem. at 31-33. But the Court does not understand Glass to be pursuing either of these events as discrete claims of discrimination or retaliation in this case. To the extent she intended to pursue such claims, her opposition is devoid of any response to the NHTSA's argument, and the Court shall therefore treat the argument as conceded. *See Hopkins*, 284 F. Supp. 2d at 25. In any event, Glass has failed to point to specific evidence that would support her allegation that she was somehow entitled to extra pay in connection with her temporary detail; indeed, she has admitted that she understood the temporary detail would not be accompanied by extra pay. Def.'s Stmt. ¶ 43; Pl.'s Stmt. ¶ 43. Meanwhile, her allegations as to the manner in which DeMeter informed her of her non-selection are unsupported by competent record support, but even crediting Glass's account, the described encounter does not rise to the level of the objectively tangible harm required to support a claim for discrimination. *See Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009).

*Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (providing that evidence of pretext is generally, but not always, sufficient to survive summary judgment).[17]  The plaintiff cannot rely on her view that the employer's actions "were imprudent or unfair; an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as . . . [discriminatory or retaliatory animus] do[es] not influence the decision." *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 125 (D.D.C. 2005) (internal quotation marks omitted).  With these principles in mind, the Court turns to explaining why Glass's Non-Selection Claim and her Failure-to-Promote Claim cannot survive summary judgment.

### A.     The NHTSA Is Entitled to Summary Judgment on Glass's Non-Selection Claim

Through her Non-Selection Claim, Glass contends that she was discriminated against on the basis of her race and sex when the NHTSA selected Fields over her to fill the vacancy in the Director of the Correspondence Research Division position in June or August 2007.  But the United States Court of Appeals for the District of Columbia Circuit has cautioned that district courts are not free "to second-guess an employer's personnel decision[s] absent demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982).  Where, as here, an employer represents that it made a selection decision based on the relative qualifications of the candidates, and has supported that representation with competent evidence in the record, the plaintiff can "directly challenge that qualifications-based explanation only if [he or she] was *significantly* better qualified for the job than those ultimately chosen." *Adeyemi v. District of*

---

[17]  Glass does not claim to have—nor has she—presented any "direct evidence" of discrimination or retaliation.  *See generally Manuel v. Potter*, 685 F. Supp. 2d 46, 60 n.11 (D.D.C. 2010) ("'[D]irect evidence' is that which, if believed by the fact-finder, establishes the fact in question without any need for an inference, including statements or documents showing a discriminatory or retaliatory animus on their face.").

*Columbia*, 525 F.3d 1222, 1227 (D.C. Cir.) (internal quotation marks omitted; emphasis in original), *cert. denied*, __ U.S. __, 129 S. Ct. 606 (2008); *see also Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (referring to a "stark superiority of credentials").  Indeed, "a qualifications gap alone will not support an inference that an employer's claim that it hired based on merit was pretextual unless the gap is 'great enough to be inherently indicative of discrimination.'" *Calhoun*, 632 F.3d at 1264 (quoting *Adeyemi*, 525 F.3d at 1227).  Ultimately, "[s]hort of finding that the employer's stated reason was indeed a pretext . . . the court must respect the employer's unfettered decision to choose among qualified candidates."  *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1189 (D.C. Cir. 1996).

>    **1.    No Reasonable Fact-Finder Could Conclude that the NHTSA's Proffered Reasons for Glass's Non-Selection for the Director of the Correspondence Research Division Were Pretextual**

In this case, while Glass expends considerable time and effort explaining why she personally believes that she is sufficiently qualified to perform the position in question, completely absent from her opposition is any attempt to compare her qualifications to the individual ultimately selected—namely, Fields.  Meanwhile, the record stands uncontradicted that Fields, the highest-rated candidate, was fully qualified to perform the position at the time of his selection.  The position involved monitoring the development of systems for maintaining safety defect data and coordinating responses to correspondence received from the general public, and in the course of his prior employment with other federal agencies, Fields had garnered relevant experience in investigating systems and accidents and in producing formal and

informal findings, data summaries, briefings, and presentations.[18]  Glass has never come forward with affirmative evidence that would permit a reasonable fact-finder to conclude that she was markedly or significantly more qualified than Fields.  Instead, Glass has elected to rest on her stated belief that she was also qualified for the position, but that argument relies on a complete misapprehension as to the governing legal standard, which requires the fact-finder to look at the candidates' relative qualifications.  Based on this record, there simply is no basis for a fact-finder to conclude that the gap in qualifications between Glass and Fields was of such a magnitude as to be "inherently indicative" of discrimination.  *Calhoun*, 632 F.3d at 1264.  Without such a showing, Glass's Non-Selection Claim must fail.

While this conclusion alone suffices to grant summary judgment in the NHTSA's favor, the record becomes even more compelling as one proceeds deeper.  Indeed, even affording Glass the most favorable inferences the record will justifiably support, the conclusion that her Non-Selection Claim is without factual and legal merit is inescapable.  Perhaps most notably, it is undisputed that Glass was ranked fourth out of a total of five candidates in a list presented to DeMeter for her consideration as the recommending official.  *See* Def.'s Ex. Y at 1.  That is, no less than three candidates—Fields, Rosen, and Carmen Bell—received higher scores than Glass.  Despite Glass's unsupported speculation to the contrary, the uncontradicted evidence in the record indicates that the list was prepared without any direct or meaningful involvement by DeMeter or Cooper (or, for that matter, anyone else who may have been the target of the

---

[18]  While both parties focus their attention on DeMeter's involvement in the selection process, the Court pauses to observe that it is undisputed that Medford, who was the actual selecting official for the position in question, independently interviewed Fields and determined that Fields was qualified for the position.

conclusory allegations of discrimination or retaliation periodically proffered by Glass). Rather, the list was created by an independent agency that administers the hiring apparatus that was used for filling the vacancy at issue in this case.

Where, as here, an employee suggests that her non-selection for a position was somehow discriminatory, she should at least attempt to provide an explanation as to why she should have been selected over three candidates that were indisputably ranked higher. As aforementioned, Glass never even attempts to show that her qualifications for the position were so markedly superior to the other candidates in the field that a fact-finder could reasonably infer discrimination from the divergence in qualifications. Rather, somewhat perplexingly, Glass has at best offered an explanation as to why Fields should have been selected over Rosen, which was what actually happened, or *vice versa*. In this regard, Glass seizes on the fact that although DeMeter's ultimate choice to fill the position was Fields, an African American male, her initial choice to fill the position was Rosen, a white male. But the record stands uncontradicted that, when DeMeter was inclined to recommend Rosen for the position, she was under the impression that he had the highest score of all the candidates. Only *after* DeMeter expressed her initial inclination to recommend Rosen did she learn that Fields was entitled to a ten-point veterans' preference that elevated his score above all the other candidates in the field. Absent that ten-point preference, Rosen would have received the highest score. No reasonable fact-finder could look at this sequence of events and conclude, as Glass suggests, that DeMeter simply preferred a white male over an African American male. Both initially and ultimately, DeMeter simply preferred the applicant with the highest score. Indeed, even Glass at times comes close to conceding that Fields was selected because he was the highest-ranked candidate and not for any

reason prohibited by Title VII.  *See* Pl.'s Opp'n at 35-38.  Meanwhile, it is undisputed that both

Fields and Rosen received a score several points above the score that Glass received: Fields

received a score of 98.07; Rosen received a score of 96.04, and Glass received a score of 90.35.

Def.'s Ex. Y at 1.  No reasonable fact-finder could infer a discriminatory animus from these

events, let alone a discriminatory animus directed towards Glass.

Further undercutting any inference of discrimination is the uncontradicted evidence in the

record that DeMeter harbored concerns about the quality of Glass's performance while she was

temporarily detailed to the Correspondence Research Division in essentially the same position for

which Glass was competing.  During this time period, DeMeter discovered several errors in the

correspondence that Glass was sending in response to inquiries from the general public.  Glass

does not actually dispute that she made at least some errors, but rather attempts to minimize their

import by situating them within the broader universe of the work that she performed or

suggesting that they should be excused because she was performing a "new task."  *See* Pl.'s

Opp'n at 37-38.  But federal courts are neither empowered nor well-equipped to serve as a

"super-personnel department" re-examining the soundness of an employer's business decisions

in the absence of any indicia of discrimination.  *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir.

2006).  In particular, this Court is not qualified to render an opinion as to how many errors, and

of what magnitude, suffice to constitute a meaningful deficiency in Glass's performance during

her temporary detail, especially where Glass concedes that some of the underlying errors actually

occurred.  *See Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002)

("Because [the plaintiff] did not contravene—and in fact admitted—many of the deficiencies the

defendants cited concerning her performance, she failed to establish that her employer's

proffered explanation was unworthy of credence.") (internal quotation marks and notations omitted). That is, based on the record created by the parties, DeMeter's stated belief about Glass's performance is "reasonable in light of the evidence," and in the absence of some countervailing evidence, there is "no basis for permitting a jury to conclude" otherwise. *Brady*, 520 F.3d at 495. Glass has provided nothing beyond her own speculation and personal belief to doubt DeMeter's assessment of her performance and her qualifications for the position relative to the other candidates. Clearly, this cannot suffice to withstand a motion for summary judgment.

In addition to the aforementioned considerations, which for the most part evince that no reasonable fact-finder could conclude that the NHTSA's proffered reasons for Glass's non-selection were pretextual as a general matter, there are also reasons that evince that no reasonable fact-finder could conclude that the NHTSA's proffered reasons were a mere pretext for race-based or sex-based discrimination specifically. Beginning first with race-based discrimination, in order to preserve the viability of her Non-Selection Claim, Glass must overcome a serious obstacle—namely, her prior testimony that she did not believe that the non-selection was motivated by race. During the course of her deposition, Glass testified as follows:

> **Q.**    **. . . . In what way was Ms. DeMeter's failure to select you for the Chief of the CRD position discriminatory against you on the basis of your race?**
>
> A.    That was not the claim — my understanding. That was not the claim.
>
> **Q.    Okay. I misunderstood then. What is the claim?**
>
> A.    I was discriminated against on the basis of sex.

Def.'s Ex. B at 79. In opposition to the instant motion, Glass attempts to undercut this testimony with an affidavit that she prepared during the course of proceedings before the agency. *See*

Def.'s Ex. A.  In that affidavit, Glass avers that her non-selection was discriminatory on the basis of both sex and race.  *Id.* ¶ 3.  Taken at face value, the affidavit and Glass's deposition testimony are irreconcilable.  The situation therefore presents an interesting variation on what is known as the "sham affidavit" rule, which "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony."  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007).  The peculiar twist in this case is that, in contrast to the typical sequence of events, the contradictory affidavit upon which Glass relies *preceded* her deposition in time.  But the timing of the affidavit is inconsequential.  While ordinarily "the affidavit comes in later to explain away or patch up an earlier deposition," there is "no principle that cabins sham affidavits to a particular sequence."  *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006).  The point is that a plaintiff cannot create a genuine dispute as to a fact she has testified to in the adversarial environment of a deposition merely by pointing to a self-serving, contradictory declaration without first "offer[ing] persuasive reasons for believing the supposed correction."  *Pyramid Secs. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir.), *cert. denied*, 502 U.S. 822 (1991).  Glass has not even attempted to explain the discrepancy here, further supporting the conclusion that no fact-finder could reasonably conclude that Glass was discriminated against on the basis of her race.

As if this were not enough to defeat Glass's claim, the fact that the ultimate selectee and the relevant decision-maker shared pertinent characteristics with Glass further undermines any inference of discrimination.  To the extent her claim is rooted in race, Glass never seems to fully acknowledge that the ultimate selectee for the position was, like Glass, an African American, a

consideration that "cuts strongly against any inference of discrimination." *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005). Similarly, to the extent her claim is rooted in sex, the fact that DeMeter is within the same protected class, if anything, also weighs against an inference of discrimination. *Washington v. Chao*, 577 F. Supp. 2d 27, 42 n.8 (D.D.C. 2008); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (suggesting that the inference of discrimination is undercut where the hiring officer is a member of the same protected class as the plaintiff). While neither of these factors is dispositive on its own, they nevertheless contribute to the conclusion that no reasonable fact-finder could conclude that Glass's non-selection was discriminatory under the circumstances presented.

## 2. Glass's Counter-Arguments Do Not Warrant a Different Result

Glass offers very little in the way of a rejoinder.[19] As a general matter, her counter-arguments are disjointed and poorly articulated, and they fail at the outset because Glass has failed to support her arguments with competent evidence in the record in the manner required by the Local Rules of this Court. *See supra* Part I. Regardless, they are each wholly unpersuasive on the merits. Some of these arguments have already been considered and rejected above; the remainder the Court shall address here *seriatim*.

---

[19] Strictly speaking, Glass dedicates the lion's share of her discussion of her Non-Selection Claim to explaining why she believes that she has established a *prima face* case of discrimination, and asserts a more narrow category of reasons that she believes support an inference of discrimination. *See* Pl.'s Opp'n at 35-38. It is now well-established that where, as here, an employer has proffered a legitimate, non-discriminatory reason for its actions, the district court should bypass the question of whether the plaintiff has established a *prima facie* case and proceed to the "central question" of whether the employer's actions were motivated by a discriminatory motive. *See Brady*, 520 F.3d at 494. Nonetheless, because the evidence supporting a plaintiff's *prima facie* case may be relevant in establishing discrimination *vel non*, the Court shall explain why none of Glass's proffered reasons suffice to withstand summary judgment.

### i.     Glass's Subjective Assessment of Her Own Performance

Glass argues most forcefully that her job performance was, contrary to the long-standing and documented assessments of her supervisors, actually "quite good." Pl.'s Opp'n at 37. Like any employee, Glass understandably has her own views about her performance. But it is axiomatic that a "[p]laintiff cannot establish pretext simply based on her own subjective assessment of her own performance." *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (internal quotation marks omitted), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002). Even assuming, *arguendo*, that this Court could credit Glass's self-assessment, she still has not provided any meaningful comparison of her qualifications relative to the qualifications of the other candidates for the position in question, let alone a comparison that would permit a reasonable fact-finder to conclude that Glass was the starkly superior candidate in the field.[20]

### ii.     The Andre Jones Declaration

Glass relies upon a cursory eight-paragraph declaration prepared by Andre Jones

---

[20] Glass also suggests, in passing and without any meaningful explanation, that her performance on a temporary detail with the Office of International Transportation and Trade has been rated as "outstanding." Pl.'s Stmt. ¶ 1. But Glass makes no attempt to show that the skill-sets required in her temporary detail and her position of record were sufficiently similar such that a fact-finder could draw a meaningful comparison between Glass's performance in the two positions. Indeed, the sparse record created by Glass suggests quite the opposite, as the proffered assessment of Glass's performance describes the work that she performed during her temporary detail as pertaining primarily to the office's "Safe Skies for Africa program and the U.S. government's trade and cooperation forum with Africa." Pl.'s Ex. 3 at 1. Glass never even attempts to explain how that sort of work has anything to do with her ability to evaluate potential defects in vehicles and determine whether a defect presents a safety-related issue. Regardless, it is undisputed that Glass did not begin her temporary detail until April 2009, nearly two years after all the events at issue in this action transpired.

("Jones"), a former employee in the Office of Defects Investigation.[21]  *See* Pl.'s Ex. 2.  Because

the "substantive" portion of the declaration—to the extent it can be characterized as such—is

decidedly brief, the Court shall quote it here in full:

> 3.    When I was eligible for a promotion in ODI, I learned I was not going to receive the promotion.
>
> 4.    After gathering as many facts as possible and talking with many of the people involved, I came to believe that my promotion was not being denied on the basis of merit but because of my race.
>
> 5.    I came to believe that Kathleen Demeter [sic] has racial animus [sic] against African Americans.  Although I never heard her make any racial slurs, I still believe that Ms. Demeter [sic] is racially bias [sic].
>
> 6.    I went to NHTSA's EEO office and filed a complaint stating that I was denied promotion because of my race.
>
> 7.    When all of the facts were reviewed, I was given a promotion.
>
> 8.    Because I feared additional retaliation against me, I filed another EEO complaint requesting a transfer from ODI.

Pl.'s Ex. 2 ¶¶ 3-8.

Glass characterizes this declaration as "powerful evidence that racial bias was at work in

denying [Jones] a promotion."  Pl.'s Opp'n at 28.  It is nothing of the sort; affidavits containing

nothing more than unsubstantiated rumors, conclusory allegations, and subjective beliefs are

wholly insufficient to establish an inference of discrimination.  *See Johnson v. DiMario*, 14 F.

Supp. 2d 107, 109-10 (D.D.C. 1998).  When a plaintiff's own subjective belief that she has been

subjected to unlawful discrimination will not suffice, a third-party's unadorned speculation will

---

[21]   The declaration implies, but never expressly states, that Jones is an African American. *See* Pl.'s Ex. 2.  For purposes of the instant motion, the Court assumes this to be the case.

fare no better. Moreover, Jones's declaration is devoid of factual allegations that would allow this Court to situate them in any meaningful context: Jones does not describe the nature of his complaint; he does not identify who aside from DeMeter was allegedly involved in the referenced promotion decision; he does not describe the extent of DeMeter's alleged involvement in that decision; he does not identify his immediate supervisor; and there is no indication in what year these events allegedly transpired. *See Holcomb*, 433 F.3d at 900 (concluding that the mere filing of third-party discrimination complaints against the decision-maker cannot be used to establish discriminatory animus "where nothing more is known about the nature, merit, or outcome of those complaints"). Glass has failed to make any effort to show that Jones's experience is "closely related . . . to [her] circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Indeed, the only allegation stated with any meaningful measure of specificity actually undermines Glass's case, as Jones readily concedes that he has "never heard [DeMeter] make any racial slurs." Pl.'s Ex. 2 ¶ 5. But that is really besides the point; far from "powerful evidence" of discrimination, a reasonable fact-finder could not draw even the weakest inference of discrimination from Jones's cursory declaration.

### iii. The Alleged June 5, 2007 Encounter with DeMeter

Glass next alleges that "[a]fter deciding that Ms. Glass would not be the new Chief of CRD, Ms. Demeter [sic] continued to look for candidates," with the apparent aim of intimating that Glass was not afforded a full and fair opportunity to compete for the position.[22] Pl.'s Opp'n at 36 (citing Def.'s Ex. A ¶ 8). In support, Glass cites only to a single paragraph from an

---

[22] This is perhaps too generous a reading of Glass's opposition memorandum, but the Court shall address the argument here out of an abundance of caution.

affidavit that she submitted on the administrative level, which does not even support the allegation. In that affidavit, Glass first alleges in a conclusory manner that DeMeter informed her that she "was not selected for the position" during an encounter on June 5, 2007. Def.'s Ex. A ¶ 8. But in the very next sentence, Glass clarifies that "Ms. Demeter [sic] specifically said, 'I am having a conflict with Human Resources. We're in negotiations; *nothing has been decided yet*.'" *Id.* (emphasis added).[23] Glass then alleges that she was formally informed that she was not selected for the position in an e-mail she received on August 3, 2007. *Id.* Consistent with this account, DeMeter has denied telling Glass that she had not been selected for the position during the June 5, 2007 encounter. *See* Def.'s Ex. R ¶ 16. In the end, Glass simply has not pointed this Court to specific evidence that would suggest that DeMeter had ruled out Glass as a candidate for the position by the designated date. But the question is, in any event, largely immaterial. There is no indication in the record that Glass was denied a full and fair opportunity to compete for the position. Indeed, it is undisputed that she was one of five final candidates culled from a broader list of eligible candidates and that she was afforded an opportunity to interview for the position. No reasonable fact-finder could pull an inference of discrimination out of this hat.

### iv. The Timing of DeMeter's Negative Feedback

Glass concludes her defense of her Non-Selection Claim with an argument the precise contours of which are not easy to define. She alleges that DeMeter "was the supervisor of a person performing a new task and did not provide her negative feedback until [Glass's] interview for the permanent position," that such "behavior could be seen by a fact finder as inconsistent with the responsibilities of a supervisor," which could in turn lead to the further inference that

---

[23] Glass attributed the same statement to DeMeter in her journal. *See* Def.'s Ex. Q at 4.

"another agenda" was being followed. Pl.'s Opp'n at 38 (citing Def.'s Ex. A ¶ 5). In support,

Glass cites to a single paragraph from an affidavit that she submitted on the administrative level,

which has no bearing upon these allegations but instead pertains to the alleged duration of her

temporary detail in the Correspondence Research Division. *See* Def.'s Ex A ¶ 5. She has not

pointed this Court to any specific evidence that would support the matters alleged.[24] *See* Fed. R.

Civ. P. 56(c)(3) (providing that the district court "need consider only the cited materials" when

resolving motions for summary judgment). Even if she had, Glass's naked attempt to "build

inference upon inference" in order to establish an inference of discrimination is without merit.

*Nurrudin v. Goldin*, 382 F. Supp. 2d 79, 106 (D.D.C. 2005), *aff'd*, 222 F. App'x 5 (D.C. Cir.

2007), *cert. denied*, 552 U.S. 1243 (2008). The chain of inferences here is so vague and

conclusory, and so far removed from the actual employment decision that is being challenged,

that a reasonable fact-finder could not draw even the weakest inference of discrimination from

these events.

In the final analysis, Glass's defense of her Non-Selection Claim is long on conspiracy

theories and painfully short on facts. She has produced no direct evidence of discriminatory

animus by the decision-maker and has failed to produce any other evidence that discredits the

underlying reason for Fields's selection and her non-selection. *See Baloch v. Kempthorne*, 550

F.3d 1191, 1198 (D.C. Cir. 2008). Based on this record, no reasonable fact-finder could

reasonably conclude that the NHTSA's qualifications-based explanation for its selection decision

was pretextual. As a result, this Court must respect the NHTSA's "unfettered discretion" to

---

[24] At the same time, DeMeter has stated in a sworn declaration that "prior to the interview, [she] had met with [Glass] on two occasions to talk about the errors [she] had found in Glass's correspondence." Def.'s Ex. R ¶ 8.

choose among qualified candidates." *Fischbach*, 86 F.3d at 1189.

**B.**    ***The NHTSA Is Entitled to Summary Judgment on Glass's Failure-to-Promote Claim***

Through her Failure-to-Promote Claim, Glass contends that she was discriminated against on the basis of her race, and retaliated against for engaging in protected activity, when she was denied a promotion to a grade GS-14 Safety Defects Engineer in or about October 2007. The NHTSA counters that Glass's performance met, but never exceeded, the expectations for a grade GS-13 Safety Defects Engineer—in other words, the NHTSA argues that Glass's performance did not merit the requested promotion. In addition, the NHTSA underscores that Glass had reached the top of her career ladder and that there was no present need to have someone working as a grade GS-14 Safety Defects Engineer, which is the "expert" level within the Office of Defects Investigation, at the time Glass requested the promotion.

**1.**    **There Is a Serious Question as to Whether Glass Can Actually Satisfy Her *Prima Facie* Burden**

In opposition to the instant motion, Glass dedicates an inordinate amount of attention to arguing that she has established a *prima facie* case. *See* Pl.'s Opp'n at 5-13. But because the NHTSA has already proffered an explanation for the challenged employment action, the focus necessarily shifts to the "central question" of discrimination *vel non*. *See Brady*, 520 F.3d at 494. Nonetheless, because Glass has affirmatively raised the issue, it is appropriate to explain at the outset why there is, at the very least, a serious question as to whether Glass can even discharge her *prima facie* burden.

In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), the Supreme Court described the plaintiff's *prima facie* burden in a discrimination case as requiring, *inter alia*, a

showing that the plaintiff "applied . . . for a job for which the employer was seeking applicants" and that "the position remained open and the employer continued to seek applicants." *Id.* at 802. But the *prima facie* proof required of a plaintiff will vary depending on the factual circumstances, and over the years the courts have articulated several variations on this basic standard depending on the nature of the claim asserted. Of particular relevance here, a plaintiff pursuing a failure-to-promote claim in this Circuit must generally show, *inter alia*, that "he applied for . . . an available position" and "either someone filled the position or the position remained vacant and the employer continued to seek applicants." *Latham v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (internal quotation marks and notations omitted). Under either of these formulations, the plaintiff must ordinarily establish that there was an available position and that the position remained vacant even after she was rejected.

But there is some ambiguity in the case law as to whether these requirements extend to all failure-to-promote claims, or merely those that are of the run-of-the-mine variety. At times, the United States Court of Appeals for the District of Columbia Circuit has made statements suggesting that a failure-to-promote claim will fail "if there is no open position" to be had. *Yarber-Butler v. Billington*, 53 F. A'ppx 120, 120 (D.C. Cir. 2002) (per curiam). At other times, it has suggested that—at least prior to discovery—a plaintiff need only show that she was denied a broader "opportunity for advancement." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006). Unfortunately, the case law by the judges on this Court does not offer a ready resolution to the ambiguity. *Compare Adesalu v. Copps*, 606 F. Supp. 2d 97, 103 (D.D.C. 2009) ("Plaintiff could not have suffered an adverse employment action for failure to promote when there were no available vacancies."), *with Perry v. Donovan*, 733 F. Supp. 2d 114, 119 (D.D.C.

2010) ("[I]t is unnecessary to show there is a vacant position for which plaintiff is eligible.").

The ambiguity may ultimately be immaterial. In this case, Glass has never argued that her Failure-to-Promote Claim is anything other than the run-of-the-mine non-promotion claim, which would require her to show both that there was an "available position" and "either someone filled the position or the position remained vacant." *Latham*, 336 F.3d at 1088. Indeed, Glass specifically relies on *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981), a case which also identifies these requirements as elements of the plaintiff's *prima facie* burden. *See* Pl.'s Opp'n at 5. Assuming these requirements apply to this case, there is a real question as to whether Glass has shown them to be satisfied. Significantly, it is undisputed that Glass had reached the top of her career ladder long before she requested a promotion in October 2007, meaning that she was not eligible for a non-competitive, career ladder promotion. Meanwhile, although Glass may have asked for a promotion to a grade GS-14 Safety Defects Engineer, she never suggests—let alone establishes—that there was actually an open GS-14 position or even that there was a need for anyone to be performing at the GS-14 level in the relevant time period. In other words, there is no indication that Glass "applied for . . . an available position." *Latham*, 336 F.3d at 1088. Under these circumstances, there is a serious question as to whether Glass can actually discharge her *prima facie* burden. However, because the NHTSA has articulated an explanation for its actions, the Court shall assume, without deciding, that Glass has established a *prima facie* case, and turn to the question of whether a fact-finder could infer an improper motive in this case.

### 2. No Reasonable Fact-Finder Could Conclude that the NHTSA's Proffered Reasons for Denying Glass's Request for a Promotion in October 2007 Were Pretextual

In this case, the essential thrust of the NHTSA's proffered explanation for its non-promotion decision is simple—Glass's supervisors reasonably concluded that her performance did not merit a promotion to grade GS-14. In support of its position, the NHTSA has submitted unrebutted evidence that Cooper believed that Glass's job performance met the expectations for a grade GS-13 Safety Defects Engineer, but that her performance simply never exceeded those expectations, an assessment in which DeMeter concurred based in part on her experience as Glass's direct supervisor during the first half of 2007. In particular, Cooper expressed concerns about Glass's level of understanding of the issues presented by investigations and the logic and rigor of her approach. Consistent with this view, Glass consistently received an average performance rating for performance years 2005 through 2007.

The NHTSA does not rely upon a naked assertion that Glass's performance did not warrant a promotion; it has supplemented its explanation with specific examples and supported those examples with competent evidence in the record. It is undisputed that grade GS-14 is the "expert" level within the Office of Defects Investigation and that an employee must, among other things, put into practice his or her technical engineering knowledge and skills and develop investigation recommendations that are well-supported by the data and reflect a sophisticated level of analysis. *See* Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 12; Def.'s Resp. ¶ 12.

In the course of discovery, Glass was asked to identify the investigations she worked on that she contends demonstrate her ability to work at the GS-14 level. In response, Glass specifically identified only three investigations—the Pontiac Vibe investigation, the Mitsubishi

investigation, and the Ford Expedition investigation. *See* Def.'s Stmt. ¶ 24 & Ex. I at 33-34; Pl.'s Stmt. ¶ 24. But the first two of these investigations were not even opened until early 2008, the year *after* Glass claims she was unfairly denied a promotion to grade GS-14, and therefore have no bearing here. *See* Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25. That leaves only the Ford Expedition investigation, and the NHTSA's showing that there were serious issues with Glass's performance in connection with that investigation stands uncontradicted by any competent evidence. Glass's closing report for the investigation required numerous re-writes, going through as many as nine drafts; and while her draft claimed to show the warranty data of windshield wiper failures due to water intrusion, the data Glass used actually reflected the number of all windshield wiper failures regardless of cause, a much larger number. *See* Def.'s Stmt. ¶¶ 27-29; Pl.'s Stmt. ¶¶ 27-29. From Cooper's perspective, this error was the result of Glass's failure to scrutinize the data before she included it in her draft report, with the end result being that there was an unacceptable disconnect between the data and her recommendation that the investigation be closed. *See* Def.'s Stmt. ¶ 30; Pl.'s Stmt. ¶ 30; Cooper Decl. ¶¶ 14-15.

Significantly, even though the Ford Expedition investigation was one of the three specific examples that Glass cited as indicative of her purported GS-14 quality work performance, and the only one that she worked on before she was allegedly denied the promotion in question, she does not actually dispute that the questions about the quality of her work on the Ford Expedition investigation were legitimate. Rather, she attempts to minimize those questions by suggesting that "she was doing her very first closing report"[25] or intimating that Cooper should bear some of the blame because he was involved in the re-writing process. *See* Pl.'s Stmt. ¶ 31; Def.'s Resp. ¶

---

[25] Glass expressly describes herself as "an inexperienced employee." Pl.'s Opp'n at 14.

31 & Ex. C at 71-72. Both these arguments are beside the point. The NHTSA simply has never

argued that Glass was a poor employee or that she was not expected to make some mistakes

when learning new tasks. Cooper readily admits that Glass's performance is consistent with the

expectations of someone working at the GS-13 level and it is undisputed that he was actively

providing Glass with opportunities to secure training in a field in which she might potentially

become a technical expert—fire investigations—between March 2006 and December 2007, the

same time frame relevant to her Failure-to-Promote Claim. *See* Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶

18. In this case, the NHTSA's argument is much more limited than Glass would have it—its

position is that Glass's performance was never exemplary, such that would warrant creating an

entirely new position at the "expert" level and promoting Glass to that level. On this point—the

only point that really matters—Glass has utterly failed to "point[] to affirmative evidence

establishing a genuine factual dispute." *Carney*, 151 F.3d at 1093. If anything, Glass's self-

serving explanations for the shortcomings in her performance reinforce, rather than rebut, the

NHTSA's proffered explanation for its non-promotion decision. *See Waterhouse*, 298 F.3d at

995 ("Because [the plaintiff] did not contravene—and in fact admitted—many of the deficiencies

the defendants cited concerning her performance, she failed to establish that her employer's

proffered explanation was unworthy of credence."). Based on this record, no reasonable fact-

finder could conclude that the NHTSA's proffered reasons for its decision to deny Glass a

promotion in October 2007 were pretextual.

> ### 3. Glass's Counter-Arguments Do Not Warrant a Different Result

In defense of her Failure-to-Promote Claim, Glass tenders a litany of arguments as to why

a jury could infer discrimination or retaliation. Once again, each of her arguments fails at the

outset because Glass has failed to support them with competent evidence in the record in the manner prescribed by the Local Rules of this Court. *See supra* Part I. Regardless, they are each wholly unpersuasive on the merits. Some of these arguments have already been considered and rejected above; the Court shall address the remainder here.

### i. Putative "Preselection" Evidence

Glass argues most forcefully that the NHTSA has supplanted the competitive selection procedures prescribed by the Merit Promotion Plan with a system of "preselection." *See* Pl.'s Opp'n at 15-21. Rather than tailoring her argument to the facts of this case, Glass launches a generalized attack on the NHTSA's hiring practices and the relationship of those practices to the Merit Promotion Plan. *See id.* So at the outset, it is important to place her argument in its context. Setting aside all the "claims" that either have not been administratively exhausted, that Glass is not pursuing as discrete acts of discrimination, or that otherwise are not properly before this Court, there are only two claims at issue in this action—the Failure-to-Promote Claim and the Non-Selection Claim. Significantly, there is no allegation (or evidence) that either of the positions relevant to these two claims were filled through "preselection" at all, let alone under circumstances that would be indicative of discrimination. On the one hand, Glass's Failure-to-Promote Claim is confined to her allegation that she was denied a promotion to a grade GS-14 Safety Defects Engineer in or about October 2007. There is no contention that anyone was "preselected" to fill a vacancy for a grade GS-14 Safety Defects Engineer in that time frame. Indeed, no one was selected at all because, as the Court has previously explained, there was no open position to be had. On the other hand, Glass's Non-Selection Claim is confined to her allegation that she was not selected for the vacancy in the Director of the Correspondence

Research Division position in June or August 2007. She does not allege that Fields, the ultimate selectee, was preselected for that position. Even if she had, as the Court has already explained, no reasonable fact-finder could conclude that the NHTSA's proffered reason for selecting Fields—namely, his superior qualifications—was a pretext for discrimination.

Meanwhile, Glass concedes that she did not actually apply for an open GS-14 Safety Defect Engineer position in the nearly four years that preceded the events underlying her Failure-to-Promote Claim. *See* Pl.'s Ex. 1 ¶ 7. While Glass suggests that she sought such a position sometime in 2003, she presents no evidence that she actually applied for the position. *See id.* ¶¶ 3-5. In any event, no reasonable fact-finder could draw an inference of discrimination based on her highly attenuated allegations. By her own account, these events transpired four years before the time period relevant to her Failure-to-Promote Claim; the position was in the Heavy Truck Division, a separate division in the Office of Defects Investigation; and the hiring supervisor was not Cooper or DeMeter but an entirely different individual who is not alleged to have any involvement in the facts underlying her Failure-to-Promote Claim. More to the point, Glass does not even bother to identify the race of the ultimate selectee, Gilbert T. Bowman ("Bowman"), which for obvious reasons precludes a reasonable fact-finder from drawing any meaningful inference of discrimination from her allegations; and Glass makes no attempt to compare her credentials to Bowman's credentials, let alone establish that her qualifications were so markedly superior that the selection decision was inherently indicative of discrimination.

Therefore, in making her preselection argument, Glass is left with allegations pertaining to different positions filled at different times. Undeterred, she speculates that a handful of promotions may have occurred through preselection, but even assuming, *arguendo*, that a pattern

50

of preselection could be gleaned from Glass's disjointed factual allegations, Glass fails to fully

acknowledge that there is nothing *per se* improper about "preselection," at least from the

standpoint of Title VII. For evidence of preselection to be relevant, there must be indicia of

discrimination attached to the preselection. *See Pearsall v. Holder*, 610 F. Supp. 2d 87, 100 n.12

(D.D.C. 2009); *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008), *aff'd*, 598 F.3d 445

(D.C. Cir. 2009). But Glass never even bothers to identify the race of all the individuals who

were allegedly the beneficiaries of the preselection process, let alone the composition of the

candidate field, the candidates' relative qualifications and experience, or the general

circumstances surrounding the selection process.[26] She makes no attempt—none—to show that

_____

[26] In the course of setting out her preselection argument, Glass identifies only three employees by name—Bowman, Rose, and John Abbott ("Abbott"). *See* Pl.'s Opp'n at 15-21. Bowman has already been discussed. Rose, a white female, was promoted to grade GS-14 on May 20, 2004, several years before the events underlying Glass's Failure-to-Promote Claim, and she secured the position through a competitive vacancy announcement. *See* Peoples Decl. ¶ 13(c). As support for her contention that Rose was "preselected," Glass relies exclusively on two pages from Rose's deposition testimony. *See* Pl.'s Opp'n at 16 (citing Pl.'s Ex. 5 at 27-28). In the cited testimony, Rose merely testified that DeMeter was "passing through" her office one day and suggested that she "may want to look at the internet, there was some job openings there, that [she] might be interested in." Pl.'s Ex. 5 at 27. Rose further testified that she found two vacancy announcements listed on the NHTSA's website and submitted an application for "one in particular that [she] had a skill-set that seemed more appropriate for." *Id.* at 28. Why Glass believes this testimony evidences preselection is far from clear; if anything, the manner in which Rose learned of, and applied for, the vacancy would seem to undercut any suggestion that she was preselected. Meanwhile, Abbott, whom the Court will assume is a white male, was promoted to grade GS-14 through a competitive announcement on December 19, 1999, approximately three years before Glass even joined the NHTSA and eight years before the events underlying her Failure-to-Promote Claim transpired. *See* Def.'s Ex. G ¶ 9. Even here, while there is some suggestion that Abbott was the preferred candidate, Glass simply has not pointed this Court to any competent evidence that would suggest that Abbott's selection for the position was a *fait accompli*. More importantly, she has completely failed to show that there were any indicia of discrimination attaching to his selection, particularly because she concedes that Abbott was qualified for the position and she fails to identify anyone in her protected class who applied for the position.

she or anyone within her protected class actually applied for the positions in question, was denied the position, and was so markedly superior to the ultimate selectee in terms of qualifications to be inherently indicative of discrimination. *See Adeyemi*, 525 F.3d at 1227. In short, Glass has not shown that any promotion decisions were motivated by any desire other than the NHTSA's interest in promoting qualified employees, something that is entirely consistent with the Merit Promotion Plan. Without such a showing, no reasonable fact-finder could infer that an improper motive was a motivating force behind the alleged pattern of preselection—let alone impute that inference to the NHTSA's decision not to promote Glass in October 2007. Glass offers nothing beyond her own speculation that an insidious intent lies behind the NHTSA's promotion practices, and her argument reduces to a generalized, and irrelevant, attack on the promotion practices allegedly employed in the Office of Defects Investigation.

### ii. Putative "Comparator" Evidence

In a similar but nevertheless distinct vein, Glass contends that when she "compares her qualifications to all others promoted to the GS-14 Safety Defects Engineer or Investigator position," she has "qualifications which are considerably better than her co-workers who were promoted." Pl.'s Opp'n at 21. Despite the extraordinary breadth of this contention, Glass never bothers to clearly identify each of the putative comparators she has in mind by name, let alone attempt to show than any of those individuals were "nearly identical" to her in all relevant aspects of their employment.[27] *See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611

---

[27] Indeed, Glass identifies only a single employee by name in the course of setting out her argument—Abbott. *See* Pl.'s Opp'n at 21-24. Even here, Glass disavows any contention that Abbott should not have been promoted, but instead argues that she was at least as qualified as Abbott when she sought a promotion in October 2007. In making this comparison, Glass selectively chooses a decidedly limited subset of her credentials—namely, her formal education

F.3d 1, 4 (D.C. Cir. 2010) (comparators must be "nearly identical" in all relevant aspects of their

employment to be similarly situated). Meanwhile, of the five individuals within the Office of

Defects Investigation who were promoted from the GS-13 level to the GS-14 level in the time

between the commencement of Glass's employment with the NHTSA and the commencement of

this action—Bowman, Rose, D. Scott Yon, Leo Yon, and Bruce York, *see* Peoples Decl. ¶¶ 13-

14—the record is devoid of any meaningful comparison of these individuals' qualifications with

those of Glass. Nor is there any indication that they were otherwise similarly situated; simply by

way of example, all five were promoted long before Glass was denied a promotion in October

2007, and not one of them appears to have shared the same first-line supervisor as Glass. *See*

Def.'s Ex. G ¶¶ 9-10; Peoples Decl. ¶¶ 13-14. At the same time, Glass provides no persuasive

rejoinder to the evidence proffered by the NHTSA showing that at least two white male

employees—Christopher Lash and Peter Kivett—have been employed as grade GS-13 Safety

---

and her training in statistical analysis. As an initial matter, the comparisons are not well-supported. For example, Glass emphasizes that she held a "Masters Degree in Engineering" and Abbott "had no engineering degree at all." *Id.* at 21-22. Setting aside the fact that Glass does not contest that there was no advanced education requirement for the position, Glass attained a master's degree in engineering *management*, not a degree in engineering. *See* Def.'s Ex. J. But the more fundamental problem with Glass's approach is the selectivity underlying her comparison. By focusing on her formal education and training in statistical analysis to the exclusion of all other considerations, the comparison becomes self-serving and incomplete, falling woefully short of showing that she and Abbott were "nearly identical" in all aspects of their employment. For example, whereas the NHTSA has shown that there were various concerns about the quality of Glass's expertise and work product, the record shows that Abbott had, prior to his promotion, developed an expertise in conducting high-profile investigations into child safety seats. Ultimately, however, perhaps the most important factor is one of timing: Abbott was promoted approximately eight years before the events underlying Glass's Failure-to-Promote Claim transpired, and three years before Glass even joined the NHTSA. *See* Def.'s Ex. G ¶ 9. Glass has failed to show that the nature of the work or the needs of the office were the same when she sought a promotion eight years later. Therefore, even assuming, *arguendo*, that Glass was as qualified as Abbott when she sought a promotion eight years later, no reasonable fact-finder could draw an inference of discrimination from this record.

Defects Engineers for a longer period of time than Glass without receiving a promotion. *See* Peoples Decl. ¶¶ 15-16.

### iii. Glass's Subjective Assessment of Her Own Performance

Once again, Glass attempts to establish a genuine dispute by repeating her subjective assessment of her own performance. *See* Pl.'s Opp'n at 7-11. Nonetheless, Glass cannot create an actionable dispute merely by repeating her personal belief that she deserves a promotion, no matter however genuine that belief may be. Absent some indication that an employer "made an error too obvious to be unintentional," a plaintiff cannot create a genuine dispute requiring trial merely by showing that her employer "misjudged [her] performance or qualifications." *Fischbach*, 86 F.3d at 1183. In this case, Glass has not adduced any affirmative evidence that would allow a fact-finder to reasonably conclude that the NHTSA's assessment of her performance is a pretext masking discrimination or retaliation. That is, based on the record created by the parties, the assessments of Glass's overall performance and her fit for the position in question are "reasonable in light of the evidence," and given Glass's failure to come forward with countervailing evidence, there is "no basis for permitting a jury to conclude" otherwise. *Brady*, 520 F.3d at 495.

### iv. Cooper's Record of Promoting African American Employees

Glass next characterizes Cooper's record for promoting African American employees as "questionable." Pl.'s Opp'n at 25. Specifically, she contends that two other African American employees—Mark Swanson ("Swanson") and Dana Douglas ("Douglas")—personally believed that Cooper's "racial bias interfered with their ability to receive promotions." Pl.'s Opp'n at 25-27 (citing Pl.'s Ex. 1 ¶¶ 14-15). In support of this contention, Glass relies exclusively upon two

cursory paragraphs from her own declaration submitted in opposition to the instant motion.  *See*

Pl.'s Ex. 1 ¶¶ 14-15.  In that declaration, Glass alleges that Swanson and Douglas were "[b]oth

interested in being promoted" and "[b]oth . . . believed that Mr. Cooper had negative opinions of

African Americans and both believed that those negative opinions interfered with their

opportunities to receive promotions while he was their supervisor."  *Id.*  There are various

reasons why Glass's declaration is not competent evidence of pretext, but the Court shall only

mention two here.  As a threshold matter, it rests on inadmissible hearsay, as the NHTSA has

suggested; and Glass has not attempted to identify an exception to the hearsay rule that would

apply under these circumstances and the Court can discern none.  Regardless, like Jones's

declaration, *see supra* Part V.A.2.ii, Glass's declaration contains nothing more than

unsubstantiated rumors, conclusory allegations, and subjective beliefs wholly devoid of any

meaningful context.[28]  No reasonable fact-finder could infer an improper motive on this basis.

### v.  Cooper's Performance Ratings and Bonus Decisions

Even though she has not asserted a claim in this action that her own performance ratings

or bonus awards were discriminatory, Glass attempts to conjure up an inference of pretext in the

performance ratings and bonuses that Cooper has given to employees.  *See* Pl.'s Opp'n at 25-26.

Specifically, she contends that three other African American employees under Cooper's

supervision—Douglas, Swanson, and Leamon Strickland ("Strickland")—received

disproportionately lower annual bonuses than other employees.  *See id.*  Glass's argument in this

---

[28]  Glass also has made no effort to show that Swanson and Douglas's experiences are
"closely related . . . to [her] circumstances and theory of the case."  *Mendelsohn*, 552 U.S. at 388.
Indeed, by her own account, Swanson was a grade GS-12 Safety Defects Engineer, meaning that
unlike Glass he was still eligible for non-competitive career ladder promotions, and Douglas was
an Administrative Assistant, meaning that she occupied a disparate position.

regard is not easy to follow, due in large part to her failure to couple her argument with specific citations to relevant evidence in the record.  In particular, Glass never takes the time to clearly explain just who these individuals were, how their performance and qualifications compared to other employees, and why their annual performance ratings or bonuses did not align with what would otherwise be expected.  Instead, Glass leaves it to this Court to sift through the record to make sense of her argument.  But "[j]udges 'are not like pigs, hunting for truffles buried in briefs' or the record."  *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  To the extent Glass thought the implications were obvious from her cited materials, she is mistaken.  A few examples will suffice.

First, Glass begins her argument by underscoring that Strickland never received a bonus from Cooper.  *See* Pl.'s Opp'n at 25 (citing Pl.'s Ex. 6).  In support of that contention, Glass cites exclusively to Strickland's deposition testimony, in which Strickland testified as follows: he has been "dissatisfied" with the bonus determinations affecting him; he does not know how those decisions were made or by whom; he has no reason to believe that those decisions were discriminatory; he does not know whether there has been "disfavoritism" in the allocation of bonuses; and he never heard a single racially derogatory remark in the entirety of his employment.  *See* Pl.'s Ex. 6 at 32-42.  How this testimony could support Glass's claim is far from clear.

Second, Glass concedes that one of the three identified employees—Swanson—actually received a bonus for the year in question, but argues without any explanation that Swanson "earned it for other reasons and Mr. Cooper had no choice but to award him the bonus."  Pl.'s

Opp'n at 26 (citing Pl.'s Ex. 4 at 116-17). In support, Glass cites exclusively to two pages from Cooper's deposition testimony, which inexplicably are not part of the exhibit accompanying her opposition. *See* Pl.'s Ex. 4. But so far as the Court can tell, her argument is this: when Cooper gave African American employees bonuses, they deserved them.[29] Again, how this could support Glass's claim is far from clear.

Third, as to the last of the three identified employees—Douglas—Glass merely states that Douglas was "given the smallest bonus for the same year." Pl.'s Opp'n at 26 (citing Pl.'s Ex. 7). According to the bonus award spreadsheet used during Cooper's deposition, Douglas received a bonus of $500 in 2007. *See* Pl.'s Ex. 7. She was also the lowest paid employee at $54,194 annual salary, *see id.*, an entirely unremarkable occurrence given that Glass has elsewhere identified Douglas as the Administrative Assistant for the group, *see* Pl.'s Ex. 1 ¶ 14.[30]

All of which is not to say that these figures are necessarily meaningless; they do, however, require a degree of explication that Glass has not even attempted to approach.

### vi. Cooper's Alleged "Change in Behavior"

Insofar as Glass's Failure-to-Promote Claim rests on retaliation, she contends that an inference of a retaliatory motive may be drawn from an alleged change in the way Cooper treated her after she conferred with an EEO counselor. *See* Pl.'s Opp'n at 32-34. Specifically, Glass alleges that she would consistently ask Cooper what her prospects were for a promotion during the course of her annual performance reviews and that, every year prior to 2007, Cooper would

---

[29] To the extent Glass intended to suggest that the bonus that Swanson received was somehow mandatory, she has failed to support that suggestion with competent evidence.

[30] Douglas's bonus represented roughly 5.4% of the total bonus pool, while her fixed compensation represented roughly 7% of the total fixed compensation for the group.

"speak with her about promotion." *See id.* at 32. According to Glass, this all changed after she approached an EEO counselor. She contends that when she met with Cooper in October 2007 for her annual performance review, she again raised the question of a promotion, but this time Cooper told her that "no promotion would occur" and failed to give her an "assessment . . . as to what she could do to obtain a promotion." *Id.* at 33. Glass characterizes this as a "change in behavior" from which a fact-finder could infer a retaliatory motive. *Id.*

Significantly, not just any change of behavior, no matter how trivial, will suffice to permit a fact-finder to infer an improper motive. Rather, there must be a "*marked* shift in the attitudes and treatment of [the employee] by supervisors." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (emphasis added). Indeed, this was the case in the single authority cited by Glass in support of her argument—the decision of the United States Court of Appeals for the District of Columbia Circuit in *Desmond v. Mukasey*, 530 F.3d 944 (D.C. Cir. 2008). In that disability discrimination case, the Court of Appeals concluded that a reasonable fact-finder could infer an improper motive based on the plaintiff's evidence that her employer "began treating him in a *markedly* different manner only after learning of" his disability. *Id.* at 963 (emphasis added). But in this case, even Glass's own account of the events in question fails to establish a material change in Cooper's treatment of her after she engaged in protected activity.

In this regard, Glass rests exclusively upon her description—tendered in an affidavit that she prepared on the administrative level—of what allegedly transpired during the meeting in question. The sum total of her description is as follows:

> In the past, during each mid year and annual performance review meeting with Mr. Cooper, I asked him what I needed to do to get a promotion and when I would be promoted. Mr. Cooper, during those times, would entertain my questions and requests, although I did not

58

> receive a promotion. Mr. Cooper recommended ways for me to
> achieve a promotion. * * * [D]uring our meeting for my annual
> performance review in October 2007, Mr. Cooper did not entertain
> my request to discuss a promotion. Instead, he responded to me that
> our Office no longer did desk audits, and that he was not going to
> advertise the position. He said I was not going to get promoted. He
> specifically said "don't ask me any more. You are not going to get
> promoted." He was very adamant and sounded frustrated as if he
> were talking to a child. He sounded different than in the past. I felt
> his response was in retaliation for my filing a previous EEO
> complaint.

Def.'s Ex. A ¶ 13. As a threshold matter, Glass's conclusory assertions that Cooper "sounded

frustrated" and "sounded different than in the past," coupled with her unadorned speculation that

Cooper's attitude must have been the result of her EEO activity, are so vague and unilluminating

that it is difficult to see how they could support an inference of retaliation. *See Nichols v. CSG

Sys., Inc.*, 245 F. App'x 937, 941 (11th Cir. 2007) (concluding that no rational fact-finder could

infer retaliation based on a cursory declaration by the plaintiff that she perceived a change in the

decision-maker's behavior and attitude). Regardless, even crediting Glass's declaration, she still

has not created a genuine dispute that there was a marked change in Cooper's treatment of her.

In her journal, Glass described her meeting with Cooper in the following manner:

> Per Tom: I am a strong GS-13; need to anticipate every possibility; I
> should get the step increase as scheduled. He will not advertise for
> the GS-14 because my past work does not demonstrate the GS-14.

Def.'s Stmt. ¶¶ 33-34 & Ex. Q at 7; Pl.'s Stmt. ¶¶ 33-34. By this account, Cooper's assessment

of Glass's performance during the October 2007 meeting was, if anything, entirely consistent

with his past appraisals of her performance. *Cf. Burton v. Batista*, 339 F. Supp. 2d 97, 112

(D.D.C. 2004) (no inference of retaliation where employee was informed of a poor performance

rating before he engaged in protected activity, even though he actually received the performance

rating thereafter).  By either account, the change in Cooper's behavior, if any, was *de minimis*.

Separately, the October 2007 meeting was sufficiently removed in time from the protected activity relied upon by Glass in this case that no reasonable fact-finder could conclude that Cooper's alleged shift in behavior was sufficiently "sudden" or "abrupt" to warrant an inference of discrimination.  *See Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006); *Planells v. Howard Univ.*, No. 82 Civ. 1173, 1983 WL 594, at *11 (D.D.C. June 26, 1983).  Glass contends that "[o]n June 19, 2007 . . . she sought out an EEO counselor" and that "less than four (4) months passed [before] . . . she was again rejected for promotion" in October 2007, Pl.'s Opp'n at 32, 34, but she has not pointed this Court to any evidence that Cooper was otherwise treating her differently in a new and abrupt manner in the time that intervened between her protected activity and her October 2007 meeting.  Indeed, the uncontested evidence in the record speaks to the contrary.  It is undisputed that, throughout this period, Cooper was actively providing Glass with opportunities to secure training in a field in which she might become an expert to better her chances at securing a promotion.  For example, with Cooper's assistance, Glass registered and attended fire training classes in August 2007 and December 2007, the same time period as the meeting in question.  *See* Pl.'s Stmt. ¶¶ 17-18; Pl.'s Stmt. ¶¶ 17-18.

### vii.    Temporal Proximity

Lastly, Glass relies upon the temporal proximity between her protected activity and the denial of her request for a promotion in October 2007 in order to raise an inference of retaliation.  *See* Pl.'s Opp'n at 34-35.  There are at least two reasons why her reliance is misplaced.  First, ordinarily, "positive evidence beyond mere [temporal] proximity is required to defeat the presumption that the proffered explanations are genuine."  *Woodruff v. Peters*, 482 F.3d 521, 530

(D.C. Cir. 2007). In this case, the only purported evidence of retaliation that Glass has proffered apart from temporal proximity is her allegation that Cooper exhibited a "change in behavior" during their October 2007 meeting, which, for reasons already discussed, is insufficient to permit a fact-finder to infer retaliation whether considered on its own or alongside the alleged temporal proximity. Second, Glass contends that "[o]n June 19, 2007 . . . she sought out an EEO counselor" and that "less than four (4) months passed [before] . . . she was again rejected for promotion" in October 2007. Pl.'s Opp'n at 32, 34. Courts have routinely held that a temporal gap of this magnitude is generally insufficient to permit a fact-finder to infer retaliation. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009). This is especially true where the employer is proceeding along lines previously contemplated," *Breeden*, 532 U.S. at 272, and the record in this case demonstrates that Glass's supervisors consistently held the same view of her performance both before and after she engaged in protected activity.

In the final analysis, Glass has failed to come forward with any affirmative evidence, considered independently or collectively, that would permit a fact-finder to reasonably conclude that the NHTSA was motivated by a discriminatory or retaliatory animus in denying her request for a promotion in October 2007. She has produced no direct evidence of discriminatory or retaliatory animus by the decision-maker and she has failed to produce any other evidence that discredits the underlying reason for the NHTSA's decision. *See Baloch*, 550 F.3d at 1198. No reasonable fact-finder could find in Glass's favor on her Failure-to-Promote Claim.

## VI.  CONCLUDING MATTERS

There is one final matter to address.  Over six months after the NHTSA's Motion for Summary Judgment had been fully briefed, Glass filed a [35] Motion to File Surreply, which the NHTSA has opposed.  The Local Rules of this Court contemplate that there ordinarily will be at most three memoranda associated with any given motion: (i) the movant's opening memorandum; (ii) the non-movant's opposition; and (iii) the movant's reply.  *See* LCvR 7. Nonetheless, when the non-movant is deprived of the opportunity to contest matters raised for the first time in the movant's reply, the non-movant may seek the district court's leave to file a surreply.  *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003).  However, surreplies are generally disfavored, *Kifafi v. Hilton Hotels Retirement Plan*, 736 F. Supp. 2d 64, 69 (D.D.C. 2010), and the determination of whether to grant or deny leave is entrusted to the sound discretion of the district court, *Akers v. Beal Bank*, __ F. Supp. 2d __, 2011 WL 81438, at *2 (D.D.C. 2011).  In exercising its discretion, the district court should consider whether the movant's reply in fact raises arguments or issues for the first time; whether the non-movant's proposed surreply would be helpful to the resolution of the pending motion; and whether the movant would be unduly prejudiced were leave to be granted.  *See id.*

Through her proposed surreply, Glass seeks to inject two new factual matters into this action—an inquiry allegedly made by the U.S. Senate into the academic backgrounds of personnel within the Office of Defects Investigation in the course of hearings concerning the acceleration system in certain Toyota automobiles, and the contents of a memorandum from the Assistant Secretary for Aviation and International Affairs concerning Glass's performance during a temporary detail in 2009 to 2010.  However, Glass does not claim that she was denied a full

and fair opportunity to contest matters raised in the NHTSA's reply papers, but rather seeks to "further amplify her clear qualifications for a promotion she did not receive." Pl.'s Reply in Supp. of Her Mot. to File a Surreply, ECF No. [36], at 1. Surreplies are generally disfavored, and are especially so where the proponent cites "amplification" of an issue already addressed as a justification. In an exercise of the Court's discretion, the motion shall be denied.

Even if the Court were to consider Glass's proposed surreply and the accompanying materials, the same result would obtain. On the one hand, a congressional inquiry into the academic credentials of agency staff in connection with an automotive safety investigation has no bearing on whether the discrete employment actions at issue in this case were discriminatory or retaliatory—Glass's employer was the NHTSA, not the U.S. Senate. On the other hand, the views of the Assistant Secretary of Aviation and International Affairs as to the quality of Glass's job performance as a "policy analyst rotational fellow" has no meaningful connection to the employment actions at issue in this case. Even crediting those views, Glass makes no attempt to show that the skill-sets required in her temporary detail and her position of record were sufficiently similar such that a fact-finder could make a meaningful comparison between Glass's performance in the two positions. Indeed, the sparse record suggests quite the opposite, as the proffered assessment of Glass's performance describes the work that she performed during her temporary detail as pertaining to the planning of international missions and working on policy background papers, tasks that are quite different from the technical task of evaluating potential defects in vehicles and determining whether a defect presents a safety-related issue. Finally, even setting aside all these issues, it is undisputed that all the events that are the subject of Glass's proposed surreply occurred in 2009 and 2010, meaning they post-dated the events at issue in this

case by at least a year.  In short, the matters discussed in Glass's proposed surreply are immaterial to the resolution of this motion.

### VII.  CONCLUSION

The Court has considered the remaining arguments tendered by the parties and has concluded that they are without merit.  Therefore, and for the reasons set forth above, the Court shall grant the NHTSA's [25] Motion for Summary Judgment, deny Glass's [35] Motion to File Surreply, and dismiss this action in its entirety.  An appropriate order accompanies this memorandum opinion.

Date: May 20, 2011

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge